T.C. Memo. 2014-124

UNITED STATES TAX COURT

SEVENTEEN SEVENTY SHERMAN STREET, LLC, MARTIN WOHNLICH,
TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19686-11.                    Filed June 19, 2014.

Jennifer E. Benda, Jeffry J. Erney, James N. Mastracchio, and Jay R.

Nanavati, for petitioner.

Sara J. Barkley, Melinda K. Fisher, Courtney L. Frola, and Luke D. Ortner,

for respondent.

[*2]        MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, Judge:  Respondent issued a notice of final partnership administrative adjustment (FPAA) pursuant to section 6223[1] to Martin Wohnlich, the tax matters partner (TMP) of Seventeen Seventy Sherman Street, LLC (Seventeen Seventy), a Colorado limited liability company.  In the FPAA, respondent disallowed Seventeen Seventy's claimed charitable contribution deduction for 2003 relating to its grant of interior and exterior conservation easements restricting the use of the Mosque of the El Jebel Shrine of the Ancient Arabic Order of Nobles of the Mystic Shrine (El Jebel Shrine), at 1770 Sherman Street, Denver, Colorado.  Petitioner, its TMP, timely filed a petition contesting respondent's determination.

The issues for decision are:  (1) whether Seventeen Seventy is entitled to a charitable contribution deduction pursuant to section 170(a) for its contribution of interior and exterior conservation easements on the El Jebel Shrine; (2) if so, the proper amount of the deduction; and (3) whether Seventeen Seventy is liable for a gross valuation misstatement penalty pursuant to section 6662(a), (b)(3), and (h)

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Some monetary amounts have been rounded to the nearest dollar.

[*3] or, in the alternative, for an accuracy-related penalty pursuant to section 6662(a) and (b)(1), (2), or (3).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts are incorporated herein by this reference. At the time the petition was filed, Seventeen Seventy's principal place of business was in Colorado.

I.    Background

In 2000 Continental Oil Field Services, Inc. (Continental Oil), purchased the real property at 1750 and 1770 Sherman Street, Denver, Colorado (Sherman Street properties), for $3.9 million.[2] The Sherman Street properties consist of a vacant lot used as a parking lot at 1750 Sherman Street (parking lot) and the El Jebel Shrine at 1770 Sherman Street. Petitioner was the majority owner of Continental Oil, and in 2002 Continental Oil transferred ownership of the Sherman Street properties to Seventeen Seventy.[3]

---

[2]The Sherman Street properties are in an area of Denver, Colorado, commonly known as "Uptown". The Uptown neighborhood is one of the oldest neighborhoods in Denver.

[3]Beginning in 2000 Seventeen Seventy held itself out as the owner of the Sherman Street properties and claimed income and deductions related to the Sherman Street properties on its Federal income tax returns. Although Seventeen Seventy did not become the legal owner of the Sherman Street properties until

(continued...)

[*4] II.    Preservation of the El Jebel Shrine

Construction of the El Jebel Shrine began in 1906 and was completed in 1907.  It is listed on the National Register of Historic Places, and the council of the city and County of Denver designated it as a structure for preservation (landmark)[4] because of its historic and architectural significance.[5]

Because the El Jebel Shrine is a designated landmark, proposed structural changes or material renovations to its exterior were subject to the approval of the Denver Landmark Preservation Commission (Landmark Commission).  However, under local ordinances in effect in 2003 designation as a landmark did not obligate property owners to rehabilitate deteriorating structures, did not prohibit building demolition, and did not protect the interior of the building.  Moreover, the Landmark Commission was unable to monitor and prevent neglect of properties designated as landmarks, and such properties sometimes fell into disrepair.  For

_____

[3](...continued)
2002, the members of Seventeen Seventy considered it the equitable owner of the Sherman Street properties from 2000 through 2002.

[4]Structures designated as landmarks are subject to regulation under Denver Revised Municipal Code, Chapter 30--Landmark Preservation.

[5]The interior of the El Jebel Shrine includes many original features from its construction in 1906, including ornate stenciling, gilded bronze elevator doors, Tiffany glass, ornate woodworking, detailed hardware, and steam heating.

[*5] these reasons, a conservation easement in Denver generally provides stronger protections, such as building monitoring and prohibition of demolition, than designation as a landmark.

III.    Planned Development of the El Jebel Shrine and the Parking Lot

Following the purchase of the Sherman Street properties by Continental Oil and the transfer of the properties to Seventeen Seventy, the members of Seventeen Seventy initially intended to develop the interior of the El Jebel Shrine into residential condominiums. Seventeen Seventy purchased architectural drawings, engineering and traffic studies, and financial projections for the purpose of developing the El Jebel Shrine into condominiums.

Architect David Tryba created the architectural drawings purchased by Seventeen Seventy. Mr. Tryba is a preservation architect with extensive experience in historic structures. The members of Seventeen Seventy hired Mr. Tryba to assist them in developing the El Jebel Shrine into condominiums. Mr. Tryba, however, proposed an alternative development plan with the goal of preserving the interior and exterior of the El Jebel Shrine and permitting development of the parking lot. His development plan involved using the preservation of the El Jebel Shrine as leverage to induce the city of Denver to

[*6] modify the zoning restrictions governing the use and development of the Sherman Street properties.

These zoning restrictions were contained in Planned Unit Development (PUD)[6] 373, which governed the use of the Sherman Street properties from the time Continental Oil purchased the Sherman Street properties through January 2003. Under PUD 373 the primary intended use of the El Jebel Shrine was as a cultural center, theater, and rental center for events. PUD 373 permitted the development of residential condominium units within the El Jebel Shrine but limited the commercial and residential development of the parking lot.

In accordance with Mr. Tryba's development plan Seventeen Seventy began negotiations with the Community Planning and Development Agency (CPDA) of the city of Denver regarding (1) a proposed PUD changing the permitted use of the Sherman Street properties, (2) the imposition of conservation easements on both the interior and exterior of the El Jebel Shrine, (3) an application for a variance from the City Park Natural History Museum Mountain View Preservation View

---

[6]A PUD amends the regional zoning maps to provide for specified uses or other conditions on designated property.

**[*7]** Ordinance (view plane variance)[7] that would permit a highrise structure to be built on the parking lot, (4) Seventeen Seventy's obligation to rehabilitate the El Jebel Shrine, and (5) CPDA's recommendations that the city of Denver's voting boards approve the proposed PUD and the view plane variance.

CPDA's position during the negotiations was that it would not recommend approval of either the proposed PUD or the view plane variance unless Seventeen Seventy committed to granting interior and exterior conservation easements on the El Jebel Shrine and committed to funding certain rehabilitation projects on the El Jebel Shrine. Seventeen Seventy's position was that it would "most likely" construct condominiums within the El Jebel Shrine if the proposed PUD and the view plane variance were not granted. Seventeen Seventy highly valued and negotiated for CPDA's recommendations that the city's voting boards approve both the proposed PUD and the view plane variance. The negotiations ultimately led to an agreement (development agreement) between the city of Denver and Seventeen Seventy wherein, among other things, Seventeen Seventy agreed to transfer interior and exterior conservation easements on the El Jebel Shrine to a

---

[7]The view plane is a restriction on the height of buildings from a specified view point within Denver's city park and is meant to preserve the view of the Rocky Mountain Skyline from that view point.

[*8] designated charity,[8] Historic Denver, Inc. (Historic Denver),[9] if the city approved changes to the designated use of the parking lot and the El Jebel Shrine.

## IV.   PUD 545 and the Development Agreement

On or before July 30, 2001, Seventeen Seventy submitted an application (Application 4578) for a zoning change on the Sherman Street properties requesting that the city of Denver change the zoning from PUD 373 to PUD 545.[10] Application 4578 proposed that PUD 545 would eliminate the authorization to develop residential condominium units within the interior of the El Jebel Shrine[11]

---

[8]The city of Denver chose to have Historic Denver hold the conservation easements on behalf of the city and for the benefit of the public instead of holding the easements itself.

[9]Historic Denver is a charitable organization described in sec. 501(c)(3) whose mission is to "preserve the historic fabric [and] distinctive architecture and cultural landscapes of Denver". Historic Denver fulfills its mission in part by accepting donations of conservation easements to protect historic properties. It annually or semiannually visits properties upon which it holds conservation easements to monitor compliance with the easements. Historic Denver may pursue legal remedies such as injunctive relief if a property is not maintained in accordance with the terms of an easement.

[10]Seventeen Seventy submitted the final version of Application 4578 on December 9, 2002.

[11]PUD 545 permits one caretaker's dwelling unit in the El Jebel Shrine but does not permit any other residential use.

[*9] but would permit development on the parking lot up to 650 feet (subject to the view plane restriction of 155 feet).

On December 6, 2002, Seventeen Seventy executed the development agreement.[12] On January 13, 2003, the Denver City Council approved the development agreement, and on January 14, 2003, the mayor of Denver executed the development agreement. The development agreement included the following key provisions: (1) CPDA planning staff would recommend approval to the City's voting board of PUD 545; (2) if PUD 545 were to be approved, Seventeen Seventy would be obligated to donate interior and exterior conservation easements on the El Jebel Shrine to Historic Denver; (3) Seventeen Seventy would apply for a view plane variance to permit development on the parking lot up to 650 feet; (4) CPDA planning staff would recommend approval of Seventeen Seventy's view plane

---

[12]On November 21, 2002, before the execution of the development agreement, Seventeen Seventy and Historic Denver executed an agreement requiring that Seventeen Seventy deliver to Historic Denver interior and exterior conservation easements on the El Jebel Shrine upon approval of PUD 545 (easement delivery agreement). The easement delivery agreement provided that Seventeen Seventy was not required to deliver the interior and exterior conservation easement deeds earlier than five years and one day from the completion of the rehabilitation work on the El Jebel Shrine as required by the development agreement.

[*10] variance request to the Denver Planning Board (Planning Board);[13] (5) if the Planning Board approved the view plane variance allowing building on the parking lot up to 400 feet, Seventeen Seventy would be required to fund certain rehabilitation obligations (Phase I rehabilitation obligations) toward the El Jebel Shrine when development occurred on the parking lot; (6) if the Planning Board approved the view plane variance allowing building on the parking lot up to 650 feet, Seventeen Seventy would be required to fund Phase I rehabilitation obligations and certain additional rehabilitation obligations (Phase II rehabilitation obligations)[14] toward the El Jebel Shrine when development occurred on the parking lot; and (7) if the Planning Board denied the view plane variance request, Seventeen Seventy would not be required to fund either the Phase I or Phase II

---

[13]Seventeen Seventy was prohibited from negotiating directly with the Planning Board because the Planning Board is an independent quasi-judicial board in charge of reviewing view plane variance requests.  Seventeen Seventy could and did, however, negotiate with CPDA to recommend approval of the view plane variance to the Planning Board.

[14]The estimated cost of the Phase I and Phase II rehabilitation obligations on the El Jebel Shrine was between $3.6 and $3.9 million.  Seventeen Seventy planned to fund the rehabilitation obligations using its own funds and available grant funds.

[*11] rehabilitation obligations (collectively, rehabilitation obligations)[15] toward the El Jebel Shrine.

On the same day that the Denver City Council approved the development agreement between Seventeen Seventy and the city of Denver (Ordinance 28), the Denver City Council approved Application 4578 changing the zoning on the Sherman Street properties to PUD 545 (Ordinance 27). Ordinances 27 and 28 became effective on January 17, 2003.[16] At that time Seventeen Seventy became obligated under the development agreement to grant interior and exterior conservation easements on the El Jebel Shrine to Historic Denver.

V.   View Plane Variance

On January 6, 2003, Seventeen Seventy submitted a view plane variance request to the Planning Board. Seventeen Seventy requested approval to build a structure on the parking lot up to 650 feet. The Planning Board is a quasi-judicial board that holds hearings on view plane variance requests and ultimately rules on

---

[15]The rehabilitation obligations are defined in a historic structure assessment attached as an exhibit to the development agreement. The historic structure assessment's summary of recommendations for rehabilitating the El Jebel Shrine defines the scope of the rehabilitation obligations.

[16]The mayor of Denver approved and signed Ordinances 27 and 28 on January 14, 2003, and both ordinances were published in the Daily Journal on January 17, 2003. Local Denver law provides that such ordinances are effective after final passage and publication.

[*12] such requests. The Planning Board--not CPDA or the Denver City Council --has the exclusive authority to grant a view plane variance request. However, in accordance with the development agreement, CPDA recommended that the Planning Board approve the view plane variance request.

On February 5, 2003, the Planning Board held a hearing on the view plane variance request. At the hearing members of the Planning Board were informed that Seventeen Seventy was obligated to grant the interior and exterior conservation easements on the El Jebel Shrine regardless of the outcome of the view plan variance request. The board members were also instructed that the rehabilitation obligations were contingent on their approval of the view plane variance request. On February 19, 2003, the Planning Board approved Seventeen Seventy's request for a view plane variance, permitting a structure to be built on the parking lot up to 650 feet. CPDA's recommendation to the Planning Board to approve Seventeen Seventy's view plane variance request was influential in the Planning Board's approval of the request. Indeed, the Planning Board would not have approved the view plane variance request without CPDA's recommendation and Seventeen Seventy's agreement to convey interior and exterior conservation easements on the El Jebel Shrine.

[*13] VI.     Conservation Easements on the El Jebel Shrine

On December 31, 2003,[17] Seventeen Seventy granted to Historic Denver

deeds of conservation easement in gross for (1) preservation of the exterior facade

of the El Jebel Shrine (exterior easement) and (2) preservation of the interior

spaces of the El Jebel Shrine (interior easement).  The deeds were recorded on that

same day.  Both the interior and exterior easements provide Historic Denver with

the authority to prohibit deterioration of the El Jebel Shrine and provide that

Seventeen Seventy is obligated to pay the costs for rehabilitation and preservation.

VII.    Consideration Received in Exchange for the Easements

Under the terms of the development agreement, Seventeen Seventy received

as consideration for the grant of the interior and exterior easements (1) the

approval of PUD 545 and (2) CPDA's recommendation to the Planning Board to

approve the view plane variance.  Petitioner introduced the expert report of Alfred

---

[17]Although Seventeen Seventy's obligation to grant the interior and exterior easements arose in January 2003, the deeds were not executed until December 31, 2003.  This approximately 11-month delay was the result of (1) difficulties that arose in drafting the easement deeds; (2) the substantial documentation required to establish a baseline for the easements; and (3) Historic Denver's being lightly staffed and relying on pro bono counsel.

[*14] Medina[18] for purposes of valuing the approval of PUD 545.[19]  Petitioner did

not value CPDA's recommendation to the Planning Board to approve the view

plane variance.

VIII.  Federal Income Tax Reporting

Seventeen Seventy filed a Form 1065, U.S. Return of Partnership Income,

with attached Form 8283, Noncash Charitable Contributions, for 2003.  Seventeen

Seventy engaged Bonnie Roerig from Bonnie Roerig & Associates, LLC, to

prepare an appraisal report to value the interior and exterior easements.  In the

appraisal report, Ms. Roerig indicated that the interior easement had a fair market

value (FMV) of $5,720,000 and the exterior easement had a FMV of $1,430,000[20]

for a total FMV of the contributed easements of $7,150,000.  Ms. Roerig valued

---

[18]Mr. Medina has extensive experience in valuing commercial real estate in Colorado, and we recognized him as an expert for purposes of valuing the parking lot and the approval of PUD 545.

[19]Mr. Medina's report valued the parking lot immediately before and after the approval of PUD 545 on January 13, 2003.  He determined that the FMV of the parking lot before the approval of PUD 545 was $775,000, and the FMV of the parking lot after approval of PUD 545 was $2,800,000, resulting in an increase in value of the parking lot of $2,025,000.  Mr. Medina attributed the parking lot's increased value to the increase in the maximum height for building on the parking lot to 155 feet.  Mr. Medina did not consider the entitlements of the view plane variance in his report.

[20]Ms. Roerig's appraisal report contains a mathematical error incorrectly stating that the value of the exterior easement is 20% of $7,150,000 = $1,144,000.

[*15] the interior and exterior easements as of December 31, 2003, the date the easements were contributed.

Seventeen Seventy also engaged Karl Leppman, a tax attorney, to provide advice regarding the requirements of section 170 and the regulations governing charitable contributions and Sarah Knight, a certified public accountant, to prepare its Form 1065. Mr. Leppman provided comments to Seventeen Seventy on drafts of the conservation easement deeds and comments regarding Ms. Roerig's appraisal of the easements. He further advised Seventeen Seventy that if it received a substantial benefit in exchange for the grant of the easements, it had to reduce the amount of its charitable contribution deduction by the FMV of the consideration received. Mr. Leppman did not review Seventeen Seventy's Form 8283.

On the Form 8283, Seventeen Seventy described the donated property as "Interior and Exterior Easements" with an appraised FMV of $7,150,000. It did not report any consideration received in the form of a bargain sale on section B, part I, line 5(g) of Form 8283. Seventeen Seventy claimed a noncash charitable contribution deduction of $7,150,000.

**[*16]** IX.     FPAA and Amendment to Answer

On May 31, 2011, respondent mailed the FPAA to petitioner determining that Seventeen Seventy had failed to establish that the contribution of the interior and exterior easements met the requirements of section 170 and consequently disallowing Seventeen Seventy's entire claimed charitable contribution deduction. In the alternative respondent determined that if the contribution of the interior and exterior easements met the requirements of section 170, the FMV of the interior and exterior easements was $2,050,000.

In an amendment to answer, respondent asserted that if the contribution of the interior and exterior easements met the requirements of section 170, the FMV of the interior and exterior easements was $400,000. Respondent further asserted in the amendment to answer that an accuracy-related penalty applied to the underpayment of tax attributable to the disallowed charitable contribution deduction. Respondent's primary assertion was that an accuracy-related penalty equal to 40% of the underpayment for a gross valuation misstatement pursuant to section 6662(a), (b)(3), and (h) applied. Alternatively, respondent asserted that the applicable penalty equaled 20% of the underpayment because of negligence or disregard of rules or regulations under section 6662(b)(1), a substantial

**[\*17]** understatement of income tax under section 6662(b)(2), or a substantial valuation misstatement under section 6662(b)(3).

OPINION

I.    Introduction

Respondent determined that Seventeen Seventy's contribution of the interior and exterior easements did not qualify as a charitable contribution deduction under section 170.  This determination is presumed correct, and petitioner must disprove it in order to prevail.  See Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111 (1933); see also Deputy v. du Pont, 308 U.S. 488, 493 (1940) (stating that deductions are a matter of legislative grace to which taxpayers must prove their entitlement).  Section 7491(a) shifts the burden of proof to the Commissioner in certain circumstances.  Petitioner does not assert nor has he proven that he is entitled to a shift in the burden of proof under section 7491(a).  Accordingly, petitioner bears the burden of proof with respect to respondent's determination that Seventeen Seventy's contribution of the interior and exterior easements did not qualify as a charitable contribution deduction under section 170.

**[\*18]** II.    <u>Charitable Contribution Deductions</u>

    A.    <u>Introduction</u>

Section 170(a)(1) provides that a deduction is allowed for any charitable contribution for which payment is made within the taxable year. If a taxpayer makes a charitable contribution in property other than money, the amount of the contribution is equal to the FMV of the property at the time of contribution. Sec. 1.170A-1(c)(1), Income Tax Regs.

Generally, taxpayers are not entitled to deduct gifts of property that consist of less than the taxpayers' entire interest in that property. Sec. 170(f)(3). An exception to this general rule is that taxpayers are permitted to deduct the value of a contribution of a partial interest in property that constitutes a "qualified conservation contribution" as defined in section 170(h)(1). Sec. 170(f)(3)(B)(iii). For a contribution to constitute a qualified conservation contribution (conservation easement), the taxpayer must show that the contribution is (1) of a "qualified real property interest", (2) to a "qualified organization", and (3) "exclusively for conservation purposes." Sec. 170(h)(1). For the donation to be deductible, the conservation purpose must be protected in perpetuity. Sec. 170(h)(5); sec. 1.170A-14(a), Income Tax Regs.

[*19] Contributions of property "generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return." United States v. Am. Bar Endowment, 477 U.S. 105, 116 (1986); see also Rolfs v. Commissioner, 135 T.C. 471, 480 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012). However, a taxpayer who receives goods or services in exchange for a contribution of property may still be entitled to a charitable contribution deduction if the taxpayer (1) makes a contribution that exceeds the FMV of the benefit the taxpayer receives and (2) makes the excess payment with the intention of making a gift.[21] Sec. 1.170A-1(h)(1), Income Tax Regs.; see also Am. Bar Endowment, 477 U.S. at 117-118. If the taxpayer satisfies these requirements, the taxpayer is entitled to a deduction, not to exceed the FMV of the property the taxpayer transferred, less the FMV of the goods or services received. Sec. 1.170A-1(h)(2), Income Tax Regs.

B.    Parties' Arguments

Respondent first contends that Seventeen Seventy is not entitled to a charitable contribution deduction because Seventeen Seventy received noncash

---

[21]This test has been applied to cases in which the payment is made in property other than money. See Rolfs v. Commissioner, 135 T.C. 471, 486-487 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012); see also Transam. Corp. v. United States, 902 F.2d 1540, 1543-1546 (Fed. Cir. 1990).

[*20] consideration in exchange for the interior and exterior easements that reduces Seventeen Seventy's claimed charitable contribution deduction to zero.[22] Alternatively, respondent contends that (1) the interior easement does not serve a conservation purpose under section 170(h)(1)(C) because it does not provide for regular public visual access pursuant to section 1.170A-14(d)(5)(iv), Income Tax Regs.; (2) Seventeen Seventy is not entitled to a charitable contribution deduction because it failed to obtain a contemporaneous written acknowledgment meeting the requirements of section 170(f)(8) and failed to disclose that the charitable contribution was made by means of a bargain sale on Form 8283 pursuant to section 1.170A-13(c)(4)(ii)(H), Income Tax Regs.; and (3) Ms. Roerig overstated the value of the interior and exterior easements in her appraisal report.[23]

_____

[22]Respondent contends that Seventeen Seventy's charitable contribution deduction is reduced to zero because (1) Seventeen Seventy did not have the requisite charitable intent to make a charitable donation, see sec. 1.170A-1(h)(1)(i), Income Tax Regs., and (2) Seventeen Seventy failed to value the consideration it received in exchange for the conservation easements.

[23]Because we find that the grant of the interior and exterior easements was part of a quid pro quo exchange and Seventeen Seventy failed to prove that the FMV of the easements exceeded the consideration it received in the exchange, the grant of the easements does not qualify for a charitable contribution deduction pursuant to sec. 170(a). See sec. 1.170A-1(h)(1), Income Tax Regs. Accordingly, we need not address any of the other grounds respondent asserts in disallowing Seventeen Seventy's claimed charitable contribution deduction.

[*21] Petitioner contends that the FMV of the interior and exterior easements exceeded the consideration Seventeen Seventy received by $5,125,000, and Seventeen Seventy is entitled to a charitable contribution deduction in this amount.[24] Petitioner also contends that (1) because Seventeen Seventy intended to make a charitable contribution of the interior and exterior easements at the time the parties executed the development agreement, Seventeen Seventy had the requisite charitable intent, see sec. 1.170A-1(h)(1)(i), Income Tax Regs.; (2) Seventeen Seventy complied with all substantiation requirements, including the contemporaneous written acknowledgment requirement or, alternatively, that respondent waived his argument regarding Seventeen Seventy's compliance with the substantiation requirements and that Seventeen Seventy's contribution of the interior and exterior easements was not a bargain sale;[25] and (3) the interior

[24]Petitioner concedes that Seventeen Seventy received consideration of $2,025,000 in exchange for the interior and exterior easements, and thus petitioner concedes that Seventeen Seventy is not entitled to its claimed $7,150,000 charitable contribution deduction.

[25]Respondent contends that Seventeen Seventy failed to substantiate its claimed deduction because it failed to obtain a contemporaneous written acknowledgment meeting the requirements of sec. 170(f)(8) and failed to disclose that the charitable contribution was made by means of a bargain sale on Form 8283 pursuant to sec. 1.170A-13(c)(4)(ii)(H), Income Tax Regs. We have previously held that the failure to obtain a contemporaneous written acknowledgment meeting the requirements of sec. 170(f)(8) and the failure to

(continued...)

**[\*22]** easement complies with the section 1.170A-14(d)(5)(iv), Income Tax Regs.,

_____

[25](...continued)
properly disclose a bargain sale may foreclose a claimed charitable contribution deduction in its entirety. See Viralam v. Commissioner, 136 T.C. 151, 171 (2011); Boone Operations Co., LLC v. Commissioner, T.C. Memo. 2013-101.

Petitioner contends that the plain language of sec. 170(f)(8) requires a description and good-faith estimate of the value of consideration received only from the donee organization (i.e., Historic Denver) and not from a third party (i.e., the city of Denver). Petitioner further contends that the transfer of the interior and exterior easements to Historic Denver was not a bargain sale and thus it had no obligation to report any consideration received on section B, part I, line 5(g) of Form 8283 under sec. 1.170A-13(c)(4)(ii)(H), Income Tax Regs. Instead, petitioner contends that any consideration received would have reduced the appraised market value of the interior and exterior easements and would have been reported on section B, part I, line 5(c) ("Appraised fair market value") or line 5(h) ("Amount claimed as a deduction").

We find dubious petitioner's contentions that Seventeen Seventy was not required to report the consideration it received from the city of Denver in exchange for the easements and that it therefore complied with the requirements of sec. 170(f)(8). The grant of the easements was a complex negotiation among Seventeen Seventy, the city of Denver, and Historic Denver. Historic Denver's role, however, was largely as the city of Denver's designee to hold the easements. Thus, we generally find persuasive respondent's argument that Seventeen Seventy was required to disclose the consideration it received in exchange for the easements to substantiate its deduction under sec. 170(f)(8). However, because we hold that the grant of the interior and exterior easements was part of a quid pro quo exchange and Seventeen Seventy failed to prove that the FMV of the easements exceeded the consideration it received in the exchange, we do not decide whether Seventeen Seventy failed to substantiate its claimed deduction because it failed to obtain a contemporaneous written acknowledgement meeting the requirements of sec. 170(f)(8) or failed to disclose that the charitable contribution was made by means of a bargain sale on Form 8283 pursuant to sec. 1.170A-13(c)(4)(ii)(H), Income Tax Regs.

**[\*23]** public access requirement or, alternatively, section 1.170A-14(d)(5)(iv), Income Tax Regs., is invalid to the extent it requires public access in contravention of section 170(h)(4)(A).

C.     Deductibility of the Grant of Conservation Easements

A taxpayer's contribution is deductible "only if and to the extent it exceeds the market value of the benefit received." Am. Bar Endowment, 477 U.S. at 117. The Supreme Court has stated that "'[t]he sine qua non of a charitable contribution is a transfer of money or property without adequate consideration.'" Hernandez v. Commissioner, 490 U.S. 680, 691 (1989) (quoting Am. Bar Endowment, 477 U.S. at 118); see also sec. 1.170A-1(h)(1), Income Tax Regs. The Court of Appeals for the Tenth Circuit, to which an appeal in this case would lie absent a stipulation to the contrary, see sec. 7482(b)(1)(E), (2), has elaborated that "'a charitable gift or contribution must be a payment made for detached and disinterested motives. This formulation is designed to ensure that the payor's primary purpose is to assist the charity and not to secure some benefit personal to the payor'", Christiansen v. Commissioner, 843 F.2d 418, 420 (10th Cir. 1988) (quoting Graham v. Commissioner, 822 F.2d 844, 848 (9th Cir. 1987), aff'g 83 T.C. 575 (1984), aff'd sub nom. Hernandez v. Commissioner, 490 U.S. 680 (1989)). The consideration received by the taxpayer need not be financial. Medical, educational, scientific,

**[*24]** religious, or other benefits can be consideration that vitiates charitable intent. Hernandez v. Commissioner, 819 F.2d 1212, 1217 (1st Cir. 1987), aff'd, 490 U.S. 680 (1989).

In determining whether a payment is a contribution or a gift, the relevant inquiry is whether the transaction in which the payment is involved is structured as a quid pro quo exchange. Hernandez v. Commissioner, 490 U.S. at 701-702. In ascertaining whether a given payment was made with the expectation of anything in return, courts examine the external features of the transaction in question. This avoids the need to conduct an imprecise inquiry into the motivations of individual taxpayers. Id. at 690-691; Christiansen v. Commissioner, 843 F.2d at 420.

The taxpayer claiming a deduction must, at a minimum, demonstrate that "he purposely contributed money or property in excess of the value of any benefit he received in return." Am. Bar Endowment, 477 U.S. at 118; see also Rolfs v. Commissioner, 135 T.C. at 489. Under section 1.170A-1(h)(1), Income Tax Regs., the taxpayer must show that he or she intended to make a charitable contribution in an amount that exceeded the FMV of the consideration received in the exchange and that he or she actually made a charitable contribution in an amount that exceeded the FMV of that consideration.

[*25] In <u>Pollard v. Commissioner</u>, T.C. Memo. 2013-38, we denied a taxpayer's claimed charitable contribution deduction for the contribution of conservation easements to Boulder County, Colorado, when the contribution was part of a quid pro quo exchange for Boulder County's approval of the taxpayer's subdivision exemption request. In <u>Pollard</u>, we held that the taxpayer did not convey the conservation easements with detached and disinterested motives but rather used them as a bargaining chip to secure the benefit of the subdivision exemption. Further, we noted that the taxpayer did not establish that the value of the conservation easements exceeded the value of the subdivision exemption granted to him and thus he had not met his burden of establishing he was entitled to a charitable contribution deduction under section 1.170A-1(h)(1) and (2), Income Tax Regs. <u>Pollard v. Commissioner</u>, at *19 n.9.

Similarly, in <u>Derby v. Commissioner</u>, T.C. Memo. 2008-45, 2008 WL 540271, we denied the taxpayers' claimed charitable contribution deductions because they failed to prove that the FMV of their contributions to a health care organization exceeded the FMV of the consideration they received. In <u>Derby</u>, a number of primary care physicians negotiated to sell their independent practice association to Sutter Health, a corporation that managed a regional health care system. The physicians and Sutter Health entered into three agreements: (1) a

[*26] professional services agreement, whereby the physicians would become shareholder-employees of Sutter Health; (2) physician employment agreements, whereby the physicians agreed to practice medicine for Sutter Health in exchange for compensation; and (3) asset purchase agreements (purchase agreements).

Under the purchase agreements Sutter Health agreed to purchase all fixtures and personal property used in each physician's business. Sutter Health and the selling physicians further agreed that the purchase price was less than the FMV and that the difference between the two values constituted a charitable contribution. Although the physicians attempted to separate the purchase agreements from the other contractual agreements, we concluded that the professional services agreements and the physician employment agreements were "integral to and legally interdependent with" the purchase agreements; therefore, the entire series of contractual agreements had to be analyzed in deciding whether a bargain sale occurred. Id., 2008 WL 540271, at *16. We concluded that, given the nature of the transaction, the physicians' "intangible assets functioned as leverage in the negotiations and that their transfer * * * resulted in an increase in the total consideration * * * [the physicians] received in the transaction." Id. at *17. We denied the claimed deductions because the physicians failed to prove that the FMV of what they transferred exceeded the FMV of what they received.

**[*27]** Furthermore, we acknowledged that even if the consideration received is difficult to value, we cannot simply disregard the consideration received "in determining whether a quid pro quo existed that defeats donative intent." Derby v. Commissioner, 2008 WL 540271, at *18.

A quid pro quo analysis ordinarily requires two parts--we value the contributed conservation easement[26] and we value the consideration received in exchange for the easement. See Rolfs v. Commissioner, 135 T.C. at 488-489; see also Derby v. Commissioner, T.C. Memo. 2008-45. However, when a taxpayer grants a conservation easement as part of a quid pro quo transaction and fails to identify or value all of the consideration received in the transaction, the taxpayer is not entitled to any charitable contribution deduction with respect to the grant of the conservation easement because he has failed to comply with section 170 and the regulations thereunder. Accordingly, we need not reach a conclusion on the value of the interior and exterior easements because we conclude that petitioner

---

[26]Where a substantial record of comparable easement sales exists, the FMV of a conservation easement is based on the sale prices of those comparable easements. Sec. 1.170A-14(h)(3)(i), Income Tax Regs. Where, as is the case here, there is no established market for similar conservation easements and no record exists of sales of such easements, the regulations provide that the FMV of a conservation easement is equal to the difference between the FMV of the property it encumbers before the grant of the easement and the FMV of the encumbered property after the grant of the easement. Id.

[*28] failed to value all of the consideration Seventeen Seventy received in the quid pro quo exchange and therefore failed to prove that the FMV of the easements exceeds the value of the consideration Seventeen Seventy received in exchange for the easements. See, e.g., Am. Bar Endowment, 477 U.S. at 106; Pollard v. Commissioner, T.C. Memo. 2013-38.[27]

### 1. The Consideration Received by Seventeen Seventy

Petitioner contends that the only valuable consideration Seventeen Seventy received in exchange for the contribution of the interior and exterior easements was the approval of PUD 545.[28] Respondent contends that in addition to the approval of PUD 545 Seventeen Seventy received approval of the view plane variance in exchange for the interior and exterior easements or, alternatively,

---

[27]In addition to proving that the FMV of the property transferred exceeded the FMV of the consideration received, a taxpayer claiming a charitable contribution deduction also must prove that he made the excess payment with the intention of making a gift. United States v. Am. Bar Endowment, 477 U.S. 105, 117-118 (1986); see also Rev. Rul. 67-246, 1967-2 C.B. 104, 105 (providing that the excess payment must be "made with the intention of making a gift"). Because petitioner failed to prove that Seventeen Seventy contributed property with a value greater than the FMV of the consideration Seventeen Seventy received in the quid pro quo exchange, we need not decide whether Seventeen Seventy had the intention of making a gift.

[28]Petitioner contends that the approval of PUD 545 increased the value of the parking lot from $775,000 to $2,800,000. Petitioner concedes that the $2,025,000 increase in value of the parking lot is consideration Seventeen Seventy received in exchange for granting the interior and exterior easements.

[*29] CPDA's recommendation to the Planning Board to approve Seventeen Seventy's view plane variance request.

Petitioner contends that the development agreement is a divisible agreement that obligated Seventeen Seventy to contribute the interior and exterior easements to Historic Denver upon approval of PUD 545 by the Denver City Council and this was before, and independent of, the Planning Board's consideration of the view plane variance. Thus, petitioner argues that each component of the development agreement can "stand on its own merit" and Seventeen Seventy's obligation to contribute the easements pursuant to the development agreement was solely in exchange for the approval of PUD 545. See, e.g., United States v. Bethlehem Steel Corp., 315 U.S. 289, 298 (1942) (stating that whether a number of promises constitute one contract or a divisible contract is determined by inquiring into whether the parties assented to all of the promises as a single whole).

Petitioner does not contend that CPDA's recommendation to the Planning Board to approve the view plane variance request is divisible from the grant of the interior and exterior easements. Indeed, we have already found that the terms of the development agreement expressly required CPDA to recommend approval of the view plane variance in exchange for the grant of the easements. See supra p. 13. Instead, petitioner contends that variances from the view plane were

[*30] "exceedingly rare" and that the independent nature of the Planning Board placed "grave doubt over whether the CPDA recommendation would have any influence over the Planning Board or any real value to the recipient of the recommendation". We disagree.

The record establishes that Seventeen Seventy highly valued and negotiated for CPDA's recommendation to the Planning Board to approve the view plane variance. The record further establishes that Seventeen Seventy used the easements as leverage to obtain CPDA's recommendation and, ultimately, the Planning Board's approval of the view plane variance. Kerry Buckey, who represents both CPDA and the Planning Board, testified that the Planning Board follows CPDA's recommendation more than 90% of the time. Wesley Becker, one of the principal members of Seventeen Seventy, testified that Seventeen Seventy highly valued CPDA's recommendation to the Planning Board to approve the view plane variance and further testified that Seventeen Seventy was aware that CPDA would not recommend approval of the view plane variance unless Seventeen Seventy committed to grant the interior and exterior easements.

We conclude that Seventeen Seventy committed to grant the easements in the quid pro quo exchange with the expectation that CPDA's recommendation would substantially increase the likelihood that the Planning Board would approve

[*31] the view plane variance.  See, e.g., Singer Co. v. United States, 449 F.2d 413

(Ct. Cl. 1971) (holding that a sewing machine manufacturer was not entitled to a

charitable contribution deduction for the sale of sewing machines to public

schools at a discount because the manufacturer gave the schools a discount with

the expectation that the students' use would result in an increase in future sales).

We further conclude that CPDA's recommendation had substantial value because

of the likelihood that the Planning Board would follow CPDA's recommendation.

Accordingly, CPDA's recommendation must be valued as part of Seventeen

Seventy's quid pro quo exchange.[29]  See Derby v. Commissioner, T.C. Memo.

---

[29]Respondent's primary contention is that Seventeen Seventy received the
Planning Board's approval of the view plane variance in exchange for the grant of
the interior and exterior easements.  While we agree with petitioner that the terms
of the development agreement do not make approval of the view plane variance
certain, we nevertheless find persuasive respondent's argument that the easements,
PUD 545, the view plane variance, and the rehabilitation obligations were
inextricably tied together.  Because we find that Seventeen Seventy received as
consideration CPDA's recommendation to the Planning Board to approve the view
plane variance and find that CPDA's recommendation had substantial value which
was not valued by Seventeen Seventy in determining its charitable contribution
deduction, we need not decide whether the Planning Board's approval of the view
plane variance was also consideration received as part of the quid pro quo
exchange.

[*32] 2008-45 (holding that the Court cannot disregard difficult-to-value

consideration in a quid pro quo exchange).[30]

### 2. Analysis of the Quid Pro Quo Exchange

When a taxpayer makes a charitable contribution as part of a quid pro quo

exchange, the taxpayer's potential deduction under section 1.170A-1(h)(2),

Income Tax Regs., may not exceed the FMV of the property transferred to the

charitable organization less the value of the consideration received in exchange.

Respondent contends that Seventeen Seventy's potential deduction is $400,000.

Petitioner contends that Seventeen Seventy's potential deduction is $7,150,000.

We need not resolve the parties' dispute regarding the value of the interior and

exterior easements because Seventeen Seventy failed to value all of the

consideration it received in the quid pro quo exchange and therefore is not entitled

to any charitable contribution deduction under section 170.

---

[30]In his opening brief, respondent acknowledges the difficulty of putting a precise value on CPDA's recommendation. However, we agree with respondent's contention that the testimony of Mr. Becker and the considerable effort expended by Seventeen Seventy to obtain CPDA's recommendation show that Seventeen Seventy highly valued the recommendation. Morever, we find that Seventeen Seventy could have estimated the value of the economic benefit it received from the Planning Board's recommendation by introducing evidence of the value of the approval of the view plane variance and evidence regarding the impact that CPDA's recommendation had on the Planning Board's approval. Seventeen Seventy did not introduce such evidence.

[*33] Petitioner has failed to provide any credible evidence to permit us to accurately decide the value of all of the consideration Seventeen Seventy received in the quid pro quo exchange.[31] The development agreement provides Seventeen Seventy with both favorable entitlements (i.e., zoning changes) and unfavorable obligations (i.e., the rehabilitation obligations). If Seventeen Seventy had met its burden of valuing all of the consideration it received in the quid pro quo exchange, see sec. 1.170A-1(h)(1) and (2), Income Tax Regs., its ultimate deduction, if any, would equal the FMV of the easements reduced by the consideration received in

_____

[31]Petitioner contends that the value of the approval of PUD 545 was $2,025,000. Petitioner does not value the effect of the view plane variance on the parking lot or CPDA's recommendation to approve the view plane variance and therefore does not value all of the consideration Seventeen Seventy received in the quid pro quo exchange. Respondent, on the other hand, values the contiguous parcel consisting of the El Jebel Shrine and the parking lot on December 31, 2003, following the approval of PUD 545 and the view plane variance. Respondent does not provide a value of the contiguous parcel before approval of PUD 545 and the view plane variance. However, respondent argues that revenue projections Seventeen Seventy presented to the Planning Board regarding the view plane variance show that Seventeen Seventy did not have the requisite charitable intent, see sec. 1.170A-1(h)(1)(i), Income Tax Regs., to qualify for a charitable contribution deduction. To the extent respondent relies on the projections to value the consideration Seventeen Seventy received in the quid pro quo exchange, we do not find the projections persuasive. The projections estimate that a developer of the parking lot following approval of the view plane variance could earn a profit of approximately $16 million. We agree with petitioner that Seventeen Seventy's projections to the Planning Board, at best, represent a potential reward for the developer of the Sherman Street properties and do not represent the FMV of the approval of PUD 545 and the view plane variance.

**[*34]** the exchange as adjusted for the burden of any rights relinquished under

PUD 545 and the rehabilitation obligations, see id. Because **[*34]** we conclude

that petitioner did not meet his burden of proving that the FMV of the easements

exceeds the value of the consideration Seventeen Seventy received in exchange for

the contribution of the easements, see sec. 1.170A-1(h)(1), Income Tax Regs., we

conclude that Seventeen Seventy is not entitled to a charitable contribution

deduction. Accordingly, we sustain respondent's determination that the

contribution of the interior and exterior easements did not qualify for a charitable

contribution deduction under section 170(a).[32]

---

[32]Even assuming arguendo that we were to find petitioner's valuation of the easements credible, it would not alter our conclusion that Seventeen Seventy is not entitled to a charitable contribution deduction. Petitioner's failure to value all of the consideration Seventeen Seventy received in the quid pro quo exchange precludes a charitable contribution deduction. Sec. 1.170A-1(h)(1) and (2), Income Tax Regs.

**[\*35]** III.     <u>Accuracy-Related Penalties</u>[33]

A.     <u>Introduction</u>

Section 6662 authorizes the imposition of a 20% penalty on the portion of

an underpayment of tax that is attributable to, among other things, (1) negligence

or disregard of rules or regulations; (2) any substantial understatement of income

tax; or (3) any substantial valuation misstatement.  Sec. 6662(a) and (b)(1), (2),

and (3).  If any part of the underpayment is attributable to a gross valuation

misstatement, the penalty is increased from 20% to 40%.  Sec. 6662(h).  Only one

accuracy-related penalty may be imposed with respect to any given portion of an

underpayment, even if that portion is attributable to more than one of the reasons

identified in section 6662(b).  Sec. 1.6662-2(c), Income Tax Regs.  Because

respondent raises the accuracy-related penalty issue in his amendment to answer,

this issue constitutes a "new matter" under Rule 142(a), and respondent bears the

---

[33]Sec. 6221 provides that the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item is determined at the partnership level.  <u>See also</u> sec. 6226(f); sec. 301.6221-1(c), Proced. & Admin. Regs.  The determination under the FPAA or under the decision of a court regarding the applicability of any penalty relating to an adjustment to a partnership item is deemed conclusive, sec. 6230(c)(4), but a partner may file a claim for refund on the ground the Commissioner erroneously computed any computational adjustment necessary to apply the decision of the Court and assert any partner-level defenses that may apply or challenge the amount of the computational adjustment, sec. 301.6221-1(c) and (d), Proced. & Admin. Regs.

**[*36]** burden of proof with respect to the penalty.  See Rule 142(a); see also Derby

v. Commissioner, T.C. Memo. 2008-45.

B.      Gross Valuation Misstatement

Respondent asserts that there is a gross valuation misstatement for

Seventeen Seventy's 2003 tax year.  A gross valuation misstatement occurs if the

value or adjusted basis of property claimed on any return is 400% or more of the

correct amount of such valuation or adjusted gross basis.  Sec. 6662(h)(2).

Seventeen Seventy reported the value of the conservation easements to be

$7,150,000 on its 2003 return.  This amount exceeds 400% of the value (i.e.,

$400,000) of the easements as determined by respondent.

Respondent called Nelson Bowes and Virginia Messick to testify as experts

on the value of the interior and exterior easements.  Mr. Bowes and Ms. Messick

(Bowes and Messick) have extensive experience in valuing commercial real estate

in Colorado, and we recognized them as experts on the value of the interior and

exterior easements.[34]

---

[34]We evaluate expert opinions in the light of each expert's qualifications and
the evidence in the record.  See Parker v. Commissioner, 86 T.C. 547, 561 (1986).
Where experts offer competing estimates of FMV, we decide how to weigh those
estimates by, among other things, examining the factors they considered in
reaching their conclusions.  See Casey v. Commissioner, 38 T.C. 357, 381 (1962).
We are not bound by an expert's opinion and may accept or reject an expert

(continued...)

[*37] Bowes and Messick determined that the highest and best use[35] of the El

Jebel Shrine on December 31, 2003, before transfer of the interior and exterior

easements, was as a historic property used as a public events center, church, or

performing arts center. They determined that the highest and best use of the

parking lot before transfer of the interior and exterior easements was development

of the parking lot for residential condominiums as a result of the approval of PUD

545 and the entitlements of the view plane variance.

Bowes and Messick relied on the comparable sales method to value the El

Jebel Shrine and the parking lot. Bowes and Messick identified five comparable

land sales and three comparable building sales--including the sale of the El Jebel

Shrine itself--and adjusted those sales for time, location, size, access, and

---

[34](...continued)
opinion in full or in part in the exercise of sound judgment. See Parker v. Commissioner, 86 T.C. at 561-562. We may also reach a decision as to value on the basis of our own examination of the evidence in the record. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), aff'g T.C. Memo. 1974-285.

[35]In deciding the FMV of property we must take into account not only the current use of the property but also its highest and best use. See Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986); sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs. A property's highest and best use is the highest and most profitable use for which it is adaptable and needed or likely to be needed in the reasonably near future. Olson v. United States, 292 U.S. 246, 255 (1934); Hilborn v. Commissioner, 85 T.C. 677, 689 (1985). If different from the current use, a proposed highest and best use requires "closeness in time" and "reasonable probability". Hilborn v. Commissioner, 85 T.C. at 689.

[*38] usability.  They determined that the value of the land--including the entitlements to construct a building on the parking lot up to 650 feet--was $2,680,000 and the value of the El Jebel Shrine was $2,150,000.  Thus, Bowes and Messick determined that the value of the parcels consisting of the El Jebel Shrine and the parking lot before the granting of the interior and exterior easements was $4,830,000.[36]

Bowes and Messick determined that the highest and best use of the El Jebel Shrine and the parking lot did not change following the transfer of the interior and exterior easements.[37]  In other words, the highest and best use of the El Jebel Shrine after the transfer of the interior and exterior easements was as a historic property used as a public events center and the highest and best use of the parking lot after the transfer of the interior and exterior easements was for residential condominiums.

---

[36]The value of a charitable contribution of a conservation easement is the FMV of the easement "at the time of the contribution."  Sec. 1.170A-14(h)(3)(i), Income Tax Regs.  When the "before and after" approach is used, the FMV of the property before contribution must take into account "zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use."  Sec. 1.170A-14(h)(3)(ii), Income Tax Regs.

[37]Bowes and Messick explain in their report that their analyses of sales of comparable properties before the grant of the interior and exterior easements are exactly the same as their analyses after the grant of the easements.

[*39] Bowes and Messick began their after valuation of the property with the before value of $4,830,000 and then analyzed how the interior and exterior easements affected the before value of the El Jebel Shrine. They determined that the interior easement decreased the FMV of the El Jebel Shrine by $400,000 and attributed this diminution in value to the decreased flexibility in design and the increased insurance costs associated with the easement. They then determined that the exterior easement did not have any effect on the value of the El Jebel Shrine because the designation of the El Jebel Shrine as a landmark effectively created a conservation easement on the facade of the El Jebel Shrine before the transfer of the exterior easement to Historic Denver.

We generally find Bowes and Messick's opinion on the value of the Sherman Street properties before the grant of the easements persuasive. However, we do not find credible Bowes and Messick's conclusion that the exterior easement had no value. They concluded that the designation of the El Jebel Shrine as a landmark effectively created a conservation easement on the facade of the El Jebel Shrine before the transfer of the exterior easement to Historic Denver. To the contrary, representatives from both the city of Denver and Historic Denver testified that the El Jebel Shrine's landmark designation did not protect the property in the same manner as a conservation easement held by a charitable

[*40] organization.  The record establishes that property owners could demolish properties designated as landmarks, that owners could modify the exterior of landmark properties with approval from the Landmark Commission and subject to zoning restrictions, and that the Landmark Commission was unable to regularly monitor the condition of landmark properties.[38]  We agree with petitioner that the decreased flexibility to modify the exterior of the El Jebel Shrine and the increased monitoring by Historic Denver leads to the conclusion that the exterior easement had value.  Therefore, we find that respondent has failed to meet his burden of establishing that the value of the conservation easements claimed on Seventeen Seventy's return (i.e., $7,150,000) exceeded 400% of the correct value of the easements.  Accordingly, we conclude that the section 6662(h) gross valuation misstatement does not apply.[39]

---

[38]Representatives from the city of Denver testified that the city highly valued the preservation of both the interior and exterior of the El Jebel Shrine.  We infer from the city of Denver's insistence that Seventeen Seventy grant the exterior easement that the exterior easement had value to the city over and above the landmark designation.

[39]For the same reasons that we find that the sec. 6662(b)(3) and (h) gross valuation misstatement penalty does not apply, we find that the substantial valuation misstatement penalty under sec. 6662(b)(3) and (e) does not apply.

[*41] C.    Negligence or Disregard of Rules or Regulations

Respondent alternatively contends that the penalty for negligence or disregard of rules or regulations within the meaning of section 6662(b)(1) applies. The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws, and the term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs. Negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return that would seem to a reasonable and prudent person to be "too good to be true" under the circumstances. Sec. 1.6662-3(b)(1)(ii), Income Tax Regs. Disregard of rules or regulations "is 'careless' if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation" and "is 'reckless' if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe." Sec. 1.6662-3(b)(2), Income Tax Regs.; see also Neely v. Commissioner, 85 T.C. 934, 947 (1985).

A taxpayer may avoid liability for the section 6662 penalty if the taxpayer had reasonable cause and acted in good faith with respect to the underpayment.

[*42] Sec. 6664(c)(1). Reasonable cause and good faith are determined on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's efforts to assess his or her proper tax liability. Id. Reliance on professional advice may constitute reasonable cause and good faith, but "it must be established that the reliance was reasonable." Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd on another issue, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991). We have previously held that the taxpayer must satisfy a three-prong test to be found to have reasonably relied on professional advice to negate a section 6662(a) accuracy-related penalty: (1) the adviser was a competent professional who had sufficient experience to justify the reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99, aff'd, 299 F.3d 221 (3d Cir. 2002).

Respondent has met his burden to show that Seventeen Seventy acted negligently or with disregard with respect to the requirements of section 170 and the regulations thereunder. We have found that the grant of the interior and exterior easements was a quid pro quo exchange. Petitioner concedes that

[*43] Seventeen Seventy received the approval of PUD 545 in exchange for the easements, and we have additionally found that Seventeen Seventy received as valuable consideration CPDA's recommendation to the Planning Board to approve the view plane variance request. Yet Seventeen Seventy reported the contribution of the conservation easements as a charitable contribution deduction at the FMV determined by Ms. Roerig without any adjustment for the consideration it received in exchange for the easements. We find that Seventeen Seventy did not make a reasonable attempt to ascertain the correctness of the charitable contribution deduction without adjusting the deduction for the consideration received.

Petitioner contends that Seventeen Seventy acted with reasonable cause and good faith through its reliance on professional advice and therefore no section 6662(a) accuracy-related penalty is applicable. With regard to its compliance with section 170, Seventeen Seventy sought the advice of Mr. Leppman. Petitioner contends that Seventeen Seventy provided Mr. Leppman with all necessary and accurate information, and that it reasonably relied in good faith on the advice of Mr. Leppman. See Freytag v. Commissioner, 89 T.C. at 888. However, Mr. Leppman testified that he advised Seventeen Seventy that it had to reduce the value of the claimed charitable contribution deduction by the consideration received in the quid pro quo exchange. Seventeen Seventy did not follow Mr.

**[*44]** Leppman's advice to reduce the value of its deduction by the consideration it received. It would be unreasonable for us to believe that at the time of the contribution and at the time of filing Seventeen Seventy's return, either Seventeen Seventy or its advisers believed that the contribution of the easements was an unrequited contribution or that the consideration received had no value. Consequently, Seventeen Seventy's disregard of Mr. Leppman's advice was not reasonable and in good faith, and therefore Seventeen Seventy cannot rely on the professional advice of Mr. Leppman to negate the section 6662(a) penalty.[40] We

---

[40]Petitioner contends that Seventeen Seventy did not disregard Mr. Leppman's advice. He contends that at the time Seventeen Seventy filed its Form 1060 it reasonably believed it received no valuable consideration in exchange for the conservation easements. Petitioner relies on a summary appraisal of the parking lot completed by Ms. Roerig before Seventeen Seventy filed its Form 1060. Ms. Roerig determined at that time that there was no increase in value to the parking lot resulting from the zoning entitlements because the burden of the rehabilitation obligations offset the value of the favorable zoning. She supported her valuation by stating that market conditions placed the potential condominium development of the parking lot in a "go slow" position. She further stated that "[a]t such time as market support for development of the property is immediate, a value study of the land could well reflect accrual of additional value to * * * [the parking lot] by virtue of its vested use rights." Yet in her appraisal of the conservation easements she attributes substantial value to Seventeen Seventy's ability to develop and market condominiums in the El Jebel Shrine during the same timeframe in which she placed the development of the parking lot in a "go slow" position. Indeed, Ms. Roerig testified that she used a "phased construction concept" to value the El Jebel Shrine; and it appears from her expert report that buyers of condominium units within the El Jebel Shrine would purchase units for full price within the first year of development and before construction was

(continued...)

[*45] sustain respondent's determination of the section 6662(a) penalty for negligence or disregard of rules and regulations.[41]

We have considered the parties' remaining arguments, and to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

An appropriate decision will be

entered.

---

[40](...continued)
complete. We are unable to resolve the apparent discrepancy in market conditions for condominium development in Ms. Roerig's analysis from our review of the record. Moreover, we do not find credible Ms. Roerig's summary appraisal of the parking lot or her conclusion that Seventeen Seventy did not receive any valuable consideration in the quid pro quo exchange. We agree with respondent that it was not reasonable for Seventeen Seventy to rely on Ms. Roerig's conclusion regarding the value of the parking lot.

[41]Because we sustain respondent's determination of the sec. 6662(a) penalty for negligence or disregard of rules and regulations, we need not consider respondent's alternative contention that the penalty applies for a substantial understatement of income tax under sec. 6662(a) and (b)(2).