# United States Tax Court

T.C. Memo. 2023-85

JANET R. BRAEN, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 24929-17,  27002-17,          Filed July 11, 2023.
27003-17,  27013-17,
27017-17,    169-18,
195-18.

————

*Kathleen M. Pakenham*, *Adriana L. Wirtz*, and *Amanda L. Liverzani*, for petitioners.

*Rachel G. Borden*, *Cathy Fung*, *Tyler J. Rippon*, *Rachel M. Munyan*, and *Anna L. Boning*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

URDA, *Judge*: In these deficiency cases, petitioners, who are various members of the Braen family (collectively, Braens), challenge the Internal Revenue Service's (IRS) disallowance of claimed charitable contribution deductions stemming from their family mining company, Braen Commercial Holdings Corp. (Holdings). In 1998 Holdings bought

---

[1] Cases of the following petitioners are consolidated herewith: Samuel Braen III and Maureen Braen, Docket No. 27002-17; Scott Braen and Cielo Destafano Braen, Docket No. 27003-17; Dirk Braen and Kerry Lynn Braen, Docket No. 27013-17, Darren Magarro and Samantha L. Braen, Docket No. 27017-17; Joshua Braen, Docket No. 169-18; and Eugene Csipkay and Kathleen Csipkay, Docket No. 195-18.

[*2] a 505-acre[2] plot of land (property) in the Town of Ramapo (Ramapo) in Rockland County, New York, with an eye to developing it into a granite quarry, adding to an existing stable of four quarries.

Years of delays and disputes with both the state and town followed, including litigation over a 2004 zoning change made by Ramapo. As part of a 2010 settlement of this lawsuit, Ramapo purchased 425.5 acres of the property for $5,250,000 and rezoned the remainder to its pre-2004 designation. Holdings' 2010 tax reporting treated the sale to Ramapo as a bargain sale that had generated a charitable contribution of $5,220,000, and the Braens claimed proportionate shares of this amount on their respective tax returns as deductions under section 170.[3] The IRS disallowed these deductions in full and determined accuracy-related penalties.

We will sustain the IRS's determinations. The Braens fail to show the value of all consideration received as part of the bargain sale and thus fall short of establishing the value (if any) of the underlying charitable contribution. The Braens accordingly are not entitled to claim any deductions with respect to the bargain sale to Ramapo.

FINDINGS OF FACT

Trial in these cases was held (via ZoomGov) from April 26 through April 30, 2021, during the Court's New York, New York, special trial session. The Braens lived in New Jersey when they timely filed the petitions in these cases.

---

[2] Throughout the pleadings in these cases (including in the stipulation), the parties have referred to the total acreage at issue as approximately 505 acres. Although the parties appear to overstate the size of the property by an acre, we will follow their convention for sake of clarity.

[3] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*3]** I.    *Overview*

A.    *Holdings*

Holdings is a family-owned S corporation[4] founded in 1904. During the years at issue, seven members of the family had stock in Holdings, either directly or through trusts on their behalf.

Two family members held positions of particular importance: Janet Braen, who acted as chief executive officer, and her stepson Scott Braen, who served as president and chief operating officer. In these positions, they were responsible for running the company's daily operations and making major decisions.

Holdings' business centered on mining, growing over time to include four quarries in New Jersey, two asphalt plants, and masonry yards. As part of its operations, the company processed the materials that it mined for a variety of end uses, including asphalt, ready-mix concrete, paving stones, and housing veneers.[5]

B.    *The Property*

In July 1996 Holdings entered into an option agreement to purchase the property for $3,500,000. To the Braens' trained eyes, the property bore all the indications of having significant deposits of granite and other minerals.

The property consisted of a 445.5-acre lot in an unincorporated portion of Ramapo and a 58.5-acre lot in the Village of Hillburn, an incorporated village within Ramapo. A mix of industry and parkland neighbored the property, with a capped landfill, various solid waste and

---

[4] A subchapter S corporation is a "small business corporation for which an election under section 1362(a)" has been made. I.R.C. § 1361(a)(1). S corporations are afforded special treatment under the Code. "One of the benefits of S corporation tax status is that income earned by the entity escapes corporate-level taxation." *Mourad v. Commissioner*, 121 T.C. 1, 3 (2003), *aff'd*, 387 F.3d 27 (1st Cir. 2004). "Thus, an S corporation's income passes through the entity and is, generally, taxed only at the shareholder level on a pro rata basis." *Id*.; *see* I.R.C. §§ 1363, 1366.

[5] In addition to Holdings, the Braens acted through other corporate entities, including Stone Industries, Inc., a wholly owned subsidiary of Holdings, and Ramapo Mountain Land Co., which was formed in 1996 to facilitate this deal. The distinctions between these family entities are not meaningful for purposes of these cases, and, for simplicity's sake, we will refer to the actions of all the family's entities as those of Holdings.

[*4] sludge composting facilities, and an electrical substation nearby, as well as the New York State thruway and Harriman State Park (part of the Palisades Interstate Park System).

The property was located near Torne Valley Road, a rugged region marked by thick woods, steep inclines, and rocky outcroppings. The area is home to spring-fed streams that feed into the Ramapo River, a significant source for the major local aquifer. Timber rattlesnakes, a threatened species protected in New York, have taken up their abode in the area.

When Holdings signed the option agreement, the Ramapo portion of the property was zoned as "planned industrial," as it had been for the previous 25 years, while the Hillburn portion fell within that village's "R-60" rural residential zoning district. Quarrying was prohibited by law in Ramapo during all relevant times.

Holdings understood that various governmental authorizations were needed to establish a quarry on the property. Specifically, quarrying required an amendment to Ramapo's zoning law removing it as a prohibited use, as well as a conditional use permit that would affirmatively allow a quarry. A state mining permit was another important prerequisite. And a quarry demanded a host of other permits and approvals relating to concerns about water protection, air pollution, stormwater runoff, and wetlands.

II.    *Initial Applications and Purchase of the Property*

   A.    *First Steps*

      1.    *Filings*

Holdings began the process to obtain the necessary approvals in the summer of 1997, petitioning Ramapo to amend its zoning law to permit quarrying. The petition asserted that a quarry would be consistent with the general industrial character of the area and that there would be limited negative impacts on surrounding residential and natural areas, such as the Ramapo River.

In late 1997 the New York State Department of Environmental Conservation (DEC) became involved, assuming authority of the environmental assessment required by New York state law because the project involved mining. DEC's arrival did not displace Ramapo or remove Holdings' need to "apply for and obtain all of the necessary Town

[*5] approvals prior to commencing the action." Holdings nonetheless hoped that a successful resolution of the DEC review would facilitate the requested zoning change.

In February 1998 Holdings, represented by an attorney named Charles Bazydlo, submitted to DEC a mining permit application, environmental assessment form, and proposed quarry plan. DEC thereafter issued a positive declaration,[6] requiring the preparation of a draft environmental impact statement. DEC enumerated several concerns: (1) the "substantial, long-term physical impact to . . . land located adjacent to . . . the Palisades Interstate Park Commission," (2) the proximity to the Ramapo landfill, a "listed Inactive Hazardous Waste Site" undergoing remediation, (3) "protected and significant water courses" running through the property, and (4) known dens of the timber rattlesnakes in the vicinity. In an accompanying letter, DEC informed Holdings that its application was "incomplete" and no further action would be taken until the draft environmental impact statement and detailed plans for mining and reclamation had been received.

2.  *Public Scoping Hearing*

DEC later convened a public "scoping" hearing at which the public vented concerns about the quarry. At the hearing public officials revealed that five villages near the proposed quarry site had passed resolutions against it.

In the course of voicing worries about the quarry's effects on the landfill, "a recently remediated Superfund site,"[7] the head of the Rockland County Conservation Association summarized the general tenor of the opposition: "[W]hile we hear that there are so many [industrial] projects in the valley . . . how much can you do to an area? How much impact can you really lay on it before you kill it entirely?"

---

[6] A "positive declaration" is a determination of the DEC that an action at issue is likely to have potential impacts on the environment. *See State Environmental Quality Review Act (SEQR)*, N.Y. State Dep't of Env't Conservation, https://www.dec.ny.gov/permits/357.html (last visited Apr. 21, 2023).

[7] The Environmental Protection Agency (EPA) designates "Superfund" sites as those contaminated with hazardous substances, for which the EPA has authority to impose the cost of cleanup on responsible parties or to provide funds for cleanup when there is no viable responsible party. *What is Superfund?*, U.S. Env't Prot. Agency, https://www.epa.gov/superfund/what-superfund (last updated Nov. 1, 2022).

[*6]    Specific concerns also came to the fore. Multiple speakers worried about traffic, with a representative from Hillburn explaining that the addition of heavy trucks for quarry operations would worsen a tenuous road situation. Others fretted about effects on the aquifer, with an engineer from United Water of New York noting that the area was "a very, very key location for providing water." And the then executive director of the Palisades Interstate Park Commission emphasized the proximity of the site to parkland, including a hiking trail that passed less than a quarter mile from the site.

DEC later received letters from hearing attendees expanding upon these points. Groups not in attendance also sent letters in opposition, including the Village of Suffern, the owner of a gas pipeline running under the property, the County of Rockland Environmental Management Council, and a New Jersey public water provider.

B.    *Purchase of the Property*

Undaunted by either the regulatory requirements or the public hearing, Holdings exercised its option to purchase the property in July 1998 for $3,500,000.

III.    *Impasse with DEC*

Over the next eight years, Holdings attempted to obtain a state mining permit but made little headway. Holdings began by submitting proposed work plans in the fall of 1998 which identified various studies and analyses it would conduct to address DEC's concerns.

After Holdings submitted a revised site plan in January 2000, DEC requested that Holdings submit a new mining permit application and full environmental assessment form "to provide an accurate representation of the extent of [its] current mining proposal." Holdings did so, recognizing that "the previously determined potential environmental issues remain unchanged." Two topics would take prominence in the revised site plan: (1) local water sources and (2) timber rattlesnakes.

A.    *Water*

During the three-year period from the initial proposed work plans in 1998 until the fall of 2001, Holdings attempted to secure DEC signoff on geologic and hydrogeologic studies needed for a mining permit. Despite    multiple    submissions    of    proposed    work    from    several

[*7] environmental engineering firms (including the Chazen Cos. (Chazen)), Holdings was unable to obtain approval to proceed with studies. United Water of New York (United Water), which took an interest because of the proposed quarry's proximity (200 feet) to the Ramapo River, repeatedly critiqued Holdings' proposed studies as "cursory-level" and insufficient. Meetings in 2001 between Chazen, DEC, and United Water did not resolve the matter, and DEC never authorized the studies.

B.    *Timber Rattlesnakes*

Holdings also was unable to reach a resolution regarding timber rattlesnakes, a species protected under New York law. Holdings commissioned four studies from 1998 to 2004 about the snakes, their presence on adjacent lands, and their use of the property.

Accompanying the last of these reports was a request that DEC conduct a conceptual review[8] on the development's potential impact on the rattlesnakes. The request acknowledged that "specific plans for the development of the property have not been finalized" but asserted that plans "without an overall concurrence of the [DEC] on the nature and extent of timber rattlesnakes utilization of the property and potential degree of impact[] represents [a] significant undue burden."

DEC declined to conduct a conceptual review, and Holdings brought a lawsuit in 2006 to force them to do so. The state court sided with DEC, concluding "that a particular and more descriptive development plan was necessary" before a conceptual review would be required. No further progress was made on this issue.

IV.    *Exploratory Discussions To Sell the Property*

While pursuing the mining permit, Holdings entertained the prospect of selling the property. In 1998 Holdings entered into an option agreement with American National Power, Inc. (American National), to sell 40 acres of the property for $4,000,000. American National, which

---

[8] Under New York regulations, "[a] project sponsor may request the regional permit administrator [from DEC] to conduct a conceptual review of the substantive consistency of the project . . . with current State environmental policy and standards." N.Y. Comp. Codes R. & Regs. Tit. 6, § 621.15(a) (2006). DEC's postconceptual review decision "is not a permit" but "intended to provide potential applicants with a binding decision from the department as to the general acceptability of a proposed project or any component or issue specified." *Id*. subdiv. (j).

[*8] intended to build a power plant on that portion of the property, never exercised its option.

Holdings revisited the possibility in 2004, discussing a bargain sale (and accompanying tax benefits) with the Trust for Public Land (Trust). During this discussion, Scott Braen made clear that a certain 60 acres of the property was not for sale because "it was the best piece for [Holdings] to keep" given its position next to the sludge plant and transfer station.

In furtherance of these discussions, Holdings commissioned the Albert Valuation Group New York, Inc., in 2006 to appraise the property, with a highest and best use of "seek[ing] approval of the necessary permits for use as a quarry for portions of the property with development of remainder portions." The appraisal determined a value of $17,500,000 by adding the value of the underlying land to the value of the mineral deposits, as instructed by counsel. As to the value of the land, the appraisal concluded that the property's per-acre value was $20,000 or $10,220,000 total. For the mineral value, the appraisal (1) relied on a mineral appraisal by a geologist named Mark Zdunczyk, who estimated that the deposits were worth $14,500,000 but (2) included a substantial discount (50%) given the uncertainty of governmental approvals.

Holdings offered to sell the property for $20,000,000, based upon the appraisal and approximately $2,500,000 of claimed carrying costs. The Trust did not take Holdings up on its offer.

V.   *Ramapo Zoning Change and Ensuing Litigation*

   A.   *2004 Zoning Litigation*

In November 2004 Ramapo passed a new comprehensive zoning law that, inter alia, changed the zoning of the Ramapo portion of the property from planned industrial to "R-40" low-density rural residential district. In its Comprehensive Plan—Draft Generic Environmental Impact Statement (Draft Comprehensive Plan), Ramapo observed that the Torne Valley Road area of Ramapo contained critical natural resources, such as the aquifer, and that "additional . . . industrial development . . . would have considerable potential to cause significant harm to these critical resources." The Draft Comprehensive Plan recommended the prohibition of "uses that have the greatest potential to cause environmental impact," such as "increase in stormwater

**[*9]** runoff," "greater amount of traffic," and "greater amount of overall land disturbance."

In March 2005 Holdings filed a lawsuit in New York state court opposing the zoning change. Mr. Bazydlo represented Holdings in the lawsuit (as he had in the timber rattlesnake litigation).

B.    *Land Purchase Agreement and Court Settlement*

1.    *Negotiations*

The parties thereafter exchanged settlement terms as part of court-ordered mediation. Holdings' initial bid was for Ramapo to purchase the property for $12,000,000 as a "bargain sale," grant Holdings a right to grade and remove material, and guarantee an additional payment of $5,500,000 if it were not able to remove sufficient material within a fixed period. Ramapo countered with a price of $10,000 per acre (approximately $5,000,000 total), which was "somewhat in excess of recent purchases by the town of undeveloped property elsewhere in the Torne Valley."

The parties ultimately homed in on a deal whereby Ramapo would buy 425 acres of the property for $5,250,000, with the zoning on the remaining 80 acres adjacent to the solid waste management complex reverting to its former industrial designation. Holdings emphasized that "certain aspects of the proposed agreement must remain in order to make the deal come to a concise and timely consummation," i.e., the rezoning of the property Holdings retained. Ramapo twice passed resolutions authorizing the purchase of this land, with the second resolution describing the purchase "as part of a court ordered settlement of an action . . . challenging the rezoning of" the property.

As talks progressed, the deal grew to include the state of New York, which agreed to supply partial funding in exchange for some of the land. In 2008 the state commissioned two appraisals of the property, both of which determined a highest and best use of residential development. The first, conducted by Valuation Plus, Inc., determined a fair market value of $3,400,000 for the 425 acres. The second, conducted by the Hudson Valley Appraisal Corp., found a fair market value of $2,900,000.

**[\*10]**      2.     *Agreement*

Holdings and Ramapo ultimately signed a land purchase agreement on February 1, 2010, with Ramapo agreeing to pay $5,250,000 for 425.5 acres of the property. The agreement stated that Ramapo was "aware that the transfer of the property [was] being undertaken by [Holdings] as a [b]argain [s]ale."

In the "Seller's Representations & Warranties" section the agreement provided that "th[e zoning] lawsuit is being settled as part of the conveyance of the [p]roperty from [Holdings] to the Town of Ramapo." In a later section entitled "Subject to Court Approval and Settlement," the agreement specified that it was "contingent on the settlement of" the zoning litigation "and the entry by the Court of an Order which shall include the subdivision of the property in substantial conformity with the proposed order appended hereto."

The proposed order provided that (1) Ramapo would subdivide the property into six lots (four in Ramapo totaling 445.5 acres and two in Hillburn totaling 58.5 acres), (2) Holdings would then sell to Ramapo five of the lots (totaling 425 acres) for $5,250,000, and (3) Ramapo, in turn, would sell three of the lots to the state of New York for $2,625,000. The draft established that Holdings would retain the remaining lot, and its zoning designation would "immediately revert to its prior designation of [planned industrial]." Of the five lots sold to Ramapo, four were contiguous, with the remaining lot separated from its fellows by the lot retained by Holdings.

The land purchase agreement also addressed the side agreement between Ramapo and New York for the sale of a portion of the property that Ramapo would receive. In a section entitled, "Subject to State of New York's Contract and Performance," the agreement provided that Ramapo's "obligation hereunder is expressly conditioned upon the execution and all necessary approvals of the contract of sale between" Ramapo and New York and stated that the agreement would be "null and void" if the agreement between Ramapo and New York was not executed.

The court approved the parties' settlement of the zoning litigation on April 12, 2010, entering an order in all pertinent respects identical to the proposed order attached to the land purchase agreement.

The property sale closed on September 29, 2010. Before the closing, Holdings' certified public accountant, Rachel Votto, advised that

**[\*11]** a Ramapo representative would need to sign Form 8283, Noncash Charitable Contributions, so that Holdings might claim a charitable contribution deduction. Holdings accordingly sent Ramapo a Form 8283, which was blank except for the phrase "see attached qualified appraisal report" in the "description of donated property" section. Although no appraisal was attached, Ramapo's then city manager signed Form 8283 at closing. Immediately following closing, Ramapo completed the sale to New York of three lots for $2,625,000.

VI.    *2010 Tax Preparation*

   A.    *Prefiling Agreement*

To prepare its 2010 tax return, Holdings retained RSM McGladrey, Inc. (McGladrey), led by Donna Aloise and Marvin Antman, McGladrey's tax director in real estate services and managing director, respectively, at that time. Holdings also secured the services of Mark Zdunczyk, who had prepared the 2005 mineral appraisal, and Robert Fader, a longtime real estate appraiser, to prepare qualified appraisals as would be required to claim a charitable contribution deduction.

In April 2011 McGladrey submitted to the IRS a request for a prefiling agreement (PFA) for Holdings's 2010 tax year, listing as "questions for determination" whether (1) Holdings had the requisite donative intent to claim a charitable contribution deduction under section 170 and (2) the transferred property's value was $26,245,000. The IRS accepted the PFA request, requiring Holdings to submit documentation related to the property and sale, including a contemporaneous written acknowledgment from Ramapo of the sale.

In the course of assisting Holdings to gather the information requested by the IRS, Mr. Bazydlo determined that Holdings had neither sought nor obtained a contemporaneous written acknowledgment from Ramapo. Mr. Bazydlo accordingly sent a draft statement prepared by Ms. Aloise to the Ramapo town attorney, asking him to "provide[] an acknowledgment that [Holdings] sold the lots to the Town for the stated price and that no other goods or services was [sic] provided for the sale."

The Ramapo attorney revised the statement to make clear that "it wasn't just a purchase of property, it was a purchase of property as part of the negotiated settlement of the lawsuit":

**[*12]** This letter will confirm that on September 29, 2010 the Town of Ramapo . . . purchased from [Holdings] for the sum of $5.25 million . . . pursuant to contract of sale dated February 1, 2010, certain vacant lands in the Torne Valley area of the town, more particularly described in Schedule A enclosed.

The Town did not provide to the Seller any goods or services, in whole or in part, as consideration for the sale. A lawsuit bearing Rockland County Index No. 1752/05 was settled incident to the sale and was approved by order of Hon. Margaret Garvey, Justice of the Supreme Court, dated April 7, 2010.

In addition to the acknowledgment McGladrey also obtained the signatures of Messrs. Fader and Zdunczyk on copies of the Form 8283 that the Ramapo city manager had signed at closing.

After receiving Holdings' supporting documentation, the IRS raised questions about the rezoning and the mineral value, and whether the appraisals were "qualified" under Treasury Regulation § 1.170A-13(c). Several months later, the IRS "withdr[ew] from further consideration of the issues described in [Holdings'] request for [a PFA]."

B. *Holdings' 2010 Tax Return*

Holdings timely filed its 2010 Form 1120S, U.S. Income Tax Return for an S Corporation, claiming a charitable contribution deduction of $5,222,000 arising out of the sale of the transferred property to Ramapo.

Holdings attached a "charitable contribution deduction explanation," which asserted a fair market value of $17,472,000 based on a mineral value of $14,554,000 for 175 acres and a land value of $2,918,263 for 212.5 acres on which no mining would be performed (with the remaining 38 acres reserved as a buffer). The explanation stated that, although Holdings "would be entitled to a charitable contribution deduction of $12,222,000," it "is only claiming a charitable contribution of $5,222,000" to avoid a dispute with the IRS over the value of the transferred property and a potential substantial or gross valuation misstatement penalty.

Holdings included with its return appraisals prepared by Messrs. Fader and Zdunczyk and three distinct copies of Form 8283. Neither

[*13] appraisal included the settlement agreement that concluded the zoning litigation or the purchase agreement between Ramapo and New York.

In his appraisal Mr. Fader concluded that the 425-acre parcel had a fair market value of $5,845,000 based on the sales comparison approach and assuming a highest and best use of "residential vacant land." Mr. Fader did not rely on any mineral valuation but noted that his report would "be presented in conjunction with a mineral appraisal survey."

For his part, Mr. Zdunczyk opined that the fair market value of the mineral deposit on the property was $14,554,000 based upon the discounted cashflow method. Relying on Mr. Bazydlo's opinion that Holdings would prevail in the zoning litigation, Mr. Zdunczyk concluded the property's highest and best use was as a quarry. Mr. Zdunczyk stated that granite covered the entire property and that any 175 of the 500 acres would contain enough rock to support a 25-year valuation.

As to the three Forms 8283, Holdings submitted one copy with the signatures of the Ramapo city manager and Mr. Fader, one copy with the signatures of the Ramapo city manager and Mr. Zdunczyk, and one copy without signatures but with details about the property. The two signed copies each included the statement "see attached qualified appraisal report" and a checkmark in the "other real estate" box in the "description of donated property" section.

The final Form 8283 described the donated property as "425.5 acres of land in Ramapo," referred to "appraisals attached" for the summary of the property's physical condition and listed an appraised fair market value of $10,472,000. Under the column "For bargain sales, enter amount received," the Form 8283 reflected $5,250,000, and under the column "Amount claimed as a deduction" the form stated $5,222,000.

C.    *Shareholders' Individual 2010 Returns*

On their 2010 individual tax returns, Holdings' shareholders claimed proportionate shares of the $5,222,000 deduction. Each of the returns included an unsigned (and in some cases, completely blank) Form 8283. These returns were prepared by the shareholders' longtime accountants, Frank Pawlowski and Mitchell Bredefeld, who relied on Schedules K-1, Shareholder's Share of Income, Deductions, and Credits, etc., provided by Holdings.

[*14] VII.   *IRS Audit and Notices of Deficiency*

The IRS began an audit of Holdings' 2010 tax return, with Ms. Votto representing Holdings. The focus of the audit was Holdings rather than its shareholders, and the assigned revenue agent understood that any penalties would be assessed later.

In an email on Christmas Eve 2013, the revenue agent informed Ms. Votto that "[t]he issues including penalties are complete" but that he had to review "the RAR and 30 day letter before [he] send[s] that out." He further explained that he "wrote the entire penalties 886-A today so do need to review that before sending." He also offered the opportunity to "discuss it with [him] after [she had] a chance to read it."

In an email exchange with his team manager on January 22, 2014, the revenue agent wrote that he had "another unpleasant phone call . . . [while] discussing penalties." He reported that he informed Ms. Votto that he "was recommending negligence and substantial understatement on all the issues except [one] which they disclosed at the beginning of the audit (still recommending substantial understatement if applicable though)." The team manager responded that "[p]enalties certainly seem appropriate from what I understand about the case."

Later that day the revenue agent faxed Ms. Votto Form 5701, Notice of Proposed Adjustment, noting in a cover sheet that the "burden is on the shareholders to show that they were reasonable and acted in good faith" with respect to penalties. The revenue agent attached to the notice, inter alia, Form 886-A, Explanation of Items, addressing penalties.

In a section entitled "Government's Position (Argument)," the revenue agent explained penalty recommendations with respect to various adjustments to Holdings' 2010 tax, including the charitable contribution adjustment, a research and development adjustment, and a pension adjustment. With respect to the charitable contribution, the revenue agent outlined the "Government's position" that an accuracy-related penalty would apply to the shareholders based either on a substantial valuation misstatement, negligence, or a substantial understatement of income tax. A page of the Form 886-A entitled "Taxpayer's Position" was blank. Although the parties were slated to meet in February 2014, the revenue agent canceled the meeting, noting

**[\*15]** that "any conversation about any of the issues, including penalties is something that will need to be addressed with appeals."

The IRS sent the shareholders 30-day letters in March 2015 pertaining to their tax years 2010–12 (depending on whether the respective shareholder and spouse had carried forward the charitable contribution deduction). The letters proposed changes to the shareholders' tax but did not assert additions to tax or penalties except for a late-filing addition to tax under section 6651(a)(1) against Samuel and Maureen Braen. In September and October 2017 the IRS sent notices of deficiency consistent with the 30-day letters.

## VIII. *Tax Court Proceedings*

The shareholders and their spouses (as applicable) timely petitioned this Court, arguing that the IRS was wrong to disallow the charitable contribution deductions. The Commissioner filed an answer in each of the consolidated cases, asserting various penalties under section 6662 and alleging that, in compliance with section 6751(b), those penalty determinations had been approved by Julia Cannarozzi, the immediate supervisor of Clare Darcy, the Commissioner's counsel in these cases (at that time). The answers were all signed by both Mses. Darcy and Cannarozzi.

## OPINION

## I. *Burden of Proof*

In general the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that the determinations are in error. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). The taxpayer bears the burden of proving entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Thus, a taxpayer claiming a deduction on a federal income tax return must demonstrate that the deduction is provided for by statute and must maintain records sufficient to enable the Commissioner to determine the correct tax liability. *See* I.R.C. § 6001; *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976); Treas. Reg. § 1.6001-1(a).

If, in any court proceeding, the taxpayer puts forth credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer and meets certain other requirements, the

**[*16]** burden of proof shifts to the Commissioner. I.R.C. § 7491(a)(1) and (2). When each party has satisfied its burden of production, then the party supported by the weight of the evidence will prevail, and thus a shift in the burden of proof has real significance only in the event of an evidentiary tie. *See Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340.

We do not perceive an evidentiary tie in these cases and are able to decide the remaining issues on the preponderance of the evidence. *See, e.g.*, *Bordelon v. Commissioner*, T.C. Memo. 2020-26, at *11.

II. *Charitable Contribution Deduction*

Section 170(a)(1) allows taxpayers a deduction for any charitable contribution made during the taxable year, so long as the taxpayer complies with "regulations prescribed by the Secretary." If the charitable contribution is of property other than money, the amount of the contribution is generally the fair market value of the property at the time of contribution. *See* Treas. Reg. § 1.170A-1(c)(1); *see also Triumph Mixed Use Invs. III, LLC v. Commissioner*, T.C. Memo. 2018-65, at *28; *Seventeen Seventy Sherman St., LLC v. Commissioner*, T.C. Memo. 2014-124, at *18.

Taxpayers also must meet several substantiation requirements to successfully claim a section 170 deduction. *See Cave Buttes, L.L.C. v. Commissioner*, 147 T.C. 338, 347–48 (2016); *Albrecht v. Commissioner*, T.C. Memo. 2022-53, at *3. As most relevant here, taxpayers must provide a contemporaneous written acknowledgment from the recipient of the contribution where the claimed value of the donated property exceeds $250. I.R.C. § 170(f)(8)(A); *Triumph*, T.C. Memo. 2018-65, at *29.

Holdings did not make a charitable contribution or gift of property to Ramapo per se. Instead, the Braens argue that the sale of the 425.5 acres represented a "bargain sale" made with donative intent and that Holdings accordingly was entitled to deduct the difference between the fair market value of the portion of the property sold and the purchase price. Our resolution of the parties' dispute hinges on two principal requirements to claim a charitable contribution deduction in connection with a bargain sale: (1) the fair market value of the property donated must exceed the value of any benefits received and (2) the taxpayer must supply a contemporaneous written acknowledgment from the recipient substantiating the contribution. We will address each in turn.

[*17]  A.  *Bargain Sale*

    1.  *Governing Standards*

"Contributions of property 'generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return.'" *Seventeen Seventy*, T.C. Memo. 2014-124, at *19 (quoting *United States v. Am. Bar Endowment*, 477 U.S. 105, 116 (1986)); *see also Emanouil v. Commissioner*, T.C. Memo. 2020-120, at *45.  According to the Supreme Court, the "relevant inquiry" focuses on "whether the transaction . . . is structured as a *quid pro quo* exchange." *Hernandez v. Commissioner*, 490 U.S. 680, 701–02 (1989).  We do not inquire into the taxpayer's subjective motives, instead giving weight to "the external features of the transaction." *Costello v. Commissioner*, T.C. Memo. 2015-87, at *26–27.  "If it is understood that the property will not pass to the charitable recipient unless the taxpayer receives a specific benefit, and if the taxpayer cannot garner that benefit unless he makes the required 'contribution,' the transfer does not qualify the taxpayer for a deduction under section 170." *Id.* at *27.

"The relevant question is whether the taxpayer expected a benefit in return for the payment; deductibility does not depend on what type of benefit the taxpayer received." *Triumph*, T.C. Memo. 2018-65, at *31 (quoting *Christiansen v. Commissioner*, 843 F.2d 418, 420 (10th Cir. 1988)); *see also Seventeen Seventy*, T.C. Memo. 2014-124, at *23–24 ("Medical, educational, scientific, religious, or other benefits can be consideration that vitiates charitable intent.").  The benefit does not need to be financial, and we "have found that a transfer of real property in exchange for development approvals . . . is a benefit and precludes a finding of the requisite donative intent." *Triumph*, T.C. Memo. 2018-65, at *32; *see also Grinslade v. Commissioner*, 59 T.C. 566, 574–76 (1973); *Pollard v. Commissioner*, T.C. Memo. 2013-38; *Ackerman Buick, Inc. v. Commissioner*, T.C. Memo. 1973-224, 1973 Tax Ct. Memo LEXIS 64, at *9 ("Receipt of a desired zoning variance from a city which would or might not be available without making a dedication of land to the city has been held to be a direct economic benefit which would preclude a charitable deduction.").

"[A] taxpayer may still deduct a contribution of property if (1) the value of the property transferred . . . exceeds the fair market value of any goods or services received in exchange and (2) the excess payment is made 'with the intention of making a gift.'" *Triumph*, T.C. Memo. 2018-65, at *29 (quoting *Am. Bar Endowment*, 477 U.S. at 117);

**[\*18]** *Seventeen Seventy*, T.C. Memo. 2014-124, at \*19; Treas. Reg. § 1.170A-1(h)(1). In that instance, taxpayers may deduct the difference between the fair market value of the contributed property and that of the goods or services provided by the charitable organization. *Boone Operations Co. v. Commissioner*, T.C. Memo. 2013-101, at \*15. Where a taxpayer, however, "fails to identify or value all of the consideration received in the transaction, the taxpayer is not entitled to any charitable contribution deduction." *Seventeen Seventy*, T.C. Memo. 2014-124, at \*27; *see also Triumph*, T.C. Memo. 2018-65, at \*35; *Boone*, T.C. Memo. 2013-101, at \*48.

### 2.  *Value of Consideration Received*

The Braens have not established the value of all consideration Holdings received as part of the purported bargain sale, and thus they are not entitled to the claimed charitable contribution deductions.

As an initial matter, the land purchase agreement and the settlement of the zoning litigation must be considered together as parts of an "inseparable package." *See Grinslade*, 59 T.C. at 574; *see also Boone*, T.C. Memo. 2013-101, at \*23 ("When a taxpayer enters into a contractual arrangement with another party and claims that a bargain sale occurred, we consider the entire contractual arrangement in determining whether the taxpayer contributed money or property in excess of the value of the benefits received."). The land purchase agreement expressly notes that the zoning litigation "is being settled as part of the conveyance of the [p]roperty." It further specifies that the purchase was conditioned on "the entry by the Court of an Order which shall include the subdivision of the property in substantial conformity with the proposed order appended hereto." And the settlement agreement unambiguously references the land purchase agreement, which was included as an attachment.

We accordingly will examine both parts of the "integrated transaction." *See Derby v. Commissioner*, T.C. Memo. 2008-45, 2008 WL 540271, at \*16. Holdings received two types of consideration: (1) $5,250,000 and (2) reversion of the zoning designation over the portion of the property Holdings retained "to its prior designation of [planned industrial]." *See, e.g.*, *Grinslade*, 59 T.C. at 576 ("[T]he zoning variance was . . . an additional financial benefit anticipated by [the taxpayers] as a result of the conveyance . . . ."); *Triumph*, T.C. Memo. 2018-65, at \*35–40; *Seventeen Seventy*, T.C. Memo. 2014-124, at \*31–33; *Ackerman*, 1973 Tax Ct. Memo LEXIS 64, at \*17.

**[\*19]** The zoning reversion was central to the overall deal. Even before Ramapo's 2004 rezoning, Holdings had emphasized that, as part of any sale, it wanted to retain "for some development purpose" the portion of the property bordering the various industrial facilities. During the court-ordered negotiations in the zoning litigation, Holdings injected the idea of rezoning and retaining that portion of the property in response to Ramapo's proposal to purchase the entirety. As the negotiations continued, Holdings made clear that rezoning a retained parcel was a sine qua non for settlement. In summary, the bargained-for zoning reversion was consideration that was required to be valued when claiming the deduction. *See Seventeen Seventy*, T.C. Memo. 2014-124, at \*30–31; *see also Triumph*, T.C. Memo. 2018-65, at \*41–42; Treas. Reg. § 1.170A-1(h)(1).

The Braens attempt to avoid this conclusion by arguing that Holdings was entitled to the zoning reversion as a matter of law and that the zoning litigation would have vindicated its entitlement. *Cf. Emanouil*, T.C. Memo. 2020-120, at \*45 (explaining that "if the taxpayer cannot garner [a] benefit unless he makes the required 'contribution', then the transfer does not qualify the taxpayer" for a section 170 deduction). The Braens rely on the opinion of Mr. Bazydlo, who represented Holdings during the zoning litigation, and their own analysis of New York law.

We decline to give weight to Mr. Bazydlo's opinions. Although we do not doubt his sincerity, Mr. Bazydlo is by-and-large offering legal opinions, which are the province of the Court. *See In re Revel AC, Inc.*, 802 F.3d 558, 567 (3d Cir. 2015) ("[L]ikelihood of success . . . involves a purely legal determination."); *Cottillion v. United Refin. Co.*, 781 F.3d 47, 59 (3d Cir. 2015); *Alumax Inc. v. Commissioner*, 109 T.C. 133, 175 (1997), *aff'd*, 165 F.3d 822 (11th Cir. 1999). Further, Mr. Bazydlo represented Holdings in the zoning litigation (and in many other capacities in connection with the property), calling into question whether his opinion is that of an impartial expert or an advocate. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 86 (2000) ("An expert witness loses his or her impartiality when he or she is too closely connected with one of the parties."), *aff'd*, 299 F.3d 221 (3d Cir. 2002); *V.R. DeAngelis M.D.P.C. v. Commissioner*, T.C. Memo. 2007-360, 2007 WL 4257483, at \*21–22, *aff'd*, 574 F.3d 789 (2d Cir. 2009).

In any event, the Braens' confidence in Holdings' ultimate success in the zoning litigation has no bearing on whether the rezoning achieved at settlement constituted a benefit. The record amply demonstrates that

**[\*20]** Holdings prized the planned industrial zoning designation for potential future development. After Ramapo's 2004 rezoning, Holdings was required to take action to secure its desired zoning. Holdings chose to obtain its end through the certain means of negotiated settlement rather than expend time and resources to continue along the unpredictable path of litigation. *See Perlmutter v. Commissioner*, 45 T.C. 311, 318 (1965) ("[Taxpayers] received a direct benefit because of the transfer. It appears from the evidence that even if the partnership might have ultimately prevailed in its efforts to get approval of its plans without making the transfers, it certainly avoided considerable and perhaps protracted difficulty in this regard by making the transfers in question.").

Although we are agnostic as to whether Holdings would have been able to prevail in litigation, we are certain that Holdings gained the significant benefit of a change to its then-governing zoning designation as part of the coordinated settlement and land purchase agreement. This benefit was required to be taken into account when analyzing any charitable contribution deduction.[9] Having failed to do so, the Braens are not entitled to the claimed charitable contribution deductions. *See Triumph*, T.C. Memo. 2018-65, at \*35, \*41–42; *Seventeen Seventy*, T.C. Memo. 2014-124, at \*27–28; *Derby v. Commissioner,* 2008 WL 540271, at \*19.

B.   *Contemporaneous Written Acknowledgment*

Even if we were to overlook Holdings' failure to value the zoning reversion, the deduction nonetheless would be barred because of a fatal defect in the contemporaneous written acknowledgment. *See* I.R.C. § 170(f)(8)(A); *Triumph*, T.C. Memo. 2018-65, at \*29.

Section 170(f)(8) requires that the contemporaneous written acknowledgment state (1) the amount of cash and a description (but not value) of any property other than cash contributed, (2) whether the

---

[9] The Braens argue that Ramapo's decision to settle the lawsuit indicates that it knew it would lose the zoning litigation. Any number of reasons might spur a party to settle a lawsuit, and we will not speculate as to motivations. *See Holmes v. Godinez*, 991 F.3d 775, 783 (7th Cir. 2021) ("Settlements are compromises in which the parties . . . sacrifice some goals to achieve others and to resolve a dispute without the expense of future litigation."); *RFF Fam. P'ship, LP v. Ross*, 814 F.3d 520, 530 (1st Cir. 2016) ("[A] settlement is born of compromise."); *Nault v. United States*, 517 F.3d 2, 6 (1st Cir. 2008) ("Parties to a settlement, almost by definition, eschew the possibility of obtaining some portion of what they would like in exchange for certain terms with which they can live.").

**[\*21]** charitable organization provided any goods or services in consideration, in whole or part, for the contributed property, and (3) a description and good-faith estimate of the value of any goods or services the taxpayer received as consideration. *Addis v. Commissioner*, 118 T.C. 528, 533–34 (2002), *aff'd*, 374 F.3d 881 (9th Cir. 2004). "A donee organization provides goods or services in consideration for a taxpayer's payment if, at the time the taxpayer makes the payment to the donee organization, the taxpayer receives or expects to receive goods or services in exchange for that payment." Treas. Reg. § 1.170A-13(f)(6). "Goods or services means cash, property, services, benefits, and privileges." *Addis*, 118 T.C. at 534 n.8; Treas. Reg. § 1.170A-13(f)(5).

The written acknowledgment and other substantiation requirements are designed to "foster disclosure of 'dual payment' or quid pro quo contributions." *Viralam v. Commissioner*, 136 T.C. 151, 171 (2011). "Where the written acknowledgment of a charitable contribution by a donee organization states that the donor received no consideration and the donor actually received a benefit in exchange for the donation, the deduction is disallowed in its entirety." *Id.*

A taxpayer's failure to supply a satisfactory contemporaneous written acknowledgment bars a charitable contribution deduction. *Izen v. Commissioner*, 148 T.C. 71, 76–77 (2017), *aff'd*, 38 F.4th 459 (5th Cir. 2022); *15 W. 17th St. LLC v. Commissioner*, 147 T.C. 557, 562–63 (2016); *Albrecht*, T.C. Memo. 2022-53, at \*3–4. The doctrine of substantial compliance does not apply in this context. *Izen*, 148 T.C. at 77; *15 W. 17th St.*, 147 T.C. at 562; *French v. Commissioner*, T.C. Memo. 2016-53, at \*8; *see also Addis v. Commissioner*, 374 F.3d at 881, 887 ("The deterrence value of [a] total denial of a deduction [in the case of an improper contemporaneous written acknowledgment] comports with the effective administration of a self-assessment and self-reporting system.").

The 2011 acknowledgment letter provided by the Ramapo town attorney does not satisfy section 170(f)(8). Holdings negotiated for and received the zoning change as part of the settlement and land purchase, and, to satisfy section 170(f)(8), the acknowledgment was required to both identify it as consideration and provide a good-faith valuation of it. The letter plainly did not do so, instead stating that Holdings did not receive "any goods or services, in whole or in part, as consideration" other than the $5,250,000. *See Viralam*, 136 T.C. at 171; *see also Boone*, T.C. Memo. 2013-101, at \*17–21.

**[\*22]** The Braens argue that the letter's statement that "[a] lawsuit bearing Rockland County Index No. 1752/05 was settled incident to the sale and was approved by order of Hon. Margaret Garvey, Justice of the Supreme Court, dated April 7, 2010" suffices to meet the statutory requirements. But "[n]othing in the statute or legislative history requires [the Commissioner] to look beyond the written acknowledgment when on its face the acknowledgment fails to provide the information required to substantiate a charitable contribution deduction." *Durden v. Commissioner*, T.C. Memo. 2012-140, 2012 WL 1758655, at \*4. Even if we were inclined to see the reference to the settlement as sufficient to identify the rezoning as consideration, neither the letter nor the settlement agreement provides a good-faith valuation as required by section 170(f)(8). *See Boone*, T.C. Memo. 2013-101, at \*21–22.

With the doctrine of substantial compliance off limits, the Braens rely on the "reasonable cause" exception of section 170(f)(11)(A)(ii)(II) to excuse the acknowledgment's shortcomings. This exception, however, does not apply to the contemporaneous written acknowledgment requirement. *See Campbell v. Commissioner*, T.C. Memo. 2020-41, at \*28 n.16.

Holdings' failure to comply with requirements of section 170(f)(8) accordingly prohibits the Braens from claiming charitable contribution deductions. *See Addis*, 118 T.C. at 537; *Albrecht*, T.C. Memo. 2022-53, at \*5–6; *Boone*, T.C. Memo. 2013-101, at \*21–22.[10]

III.  *Accuracy-Related Penalties*

In his answers, the Commissioner determined a 20% accuracy-related penalty against each of the Braens, premised on negligence, a substantial understatement of income tax, and a substantial valuation misstatement. *See* I.R.C. § 6662(a), (b)(1)–(3), (c), (d), and (e). He further determined an addition to tax under section 6651(a)(1) against Samuel and Maureen Braen.

Section 7491(c) generally provides that "the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty." This burden requires the

---

[10] Given the Braens' failure to establish the value of the consideration received and to supply a contemporaneous written acknowledgment, we need not address the other issues that might justify disallowance of the deductions. *See Triumph*, T.C. Memo. 2018-65, at \*30; *Boone*, T.C. Memo. 2013-101, at \*22.

**[\*23]** Commissioner to come forward with sufficient evidence indicating that the imposition of the penalty is appropriate. *See Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). Once he meets his burden of production, the burden of proof is on the taxpayer to "come forward with evidence sufficient to persuade a Court that the Commissioner's determination is incorrect." *Id.* at 447.

Where penalties are first asserted in an answer, the Commissioner bears the burdens of both production and proof as to the applicability of those penalties. Rule 142(a)(1); *Huzella v. Commissioner*, T.C. Memo. 2017-210, at \*9–10. He also "bears the burden of proving the absence of reasonable cause for the Court to impose the penalty if the penalty is either a 'new matter' or an 'increase[]' in deficiency' within the meaning of Rule 142(a)." *Rogers v. Commissioner*, T.C. Memo. 2018-53, at \*123–24, *aff'd*, 9 F.4th 576 (7th Cir. 2021).

A.     *Supervisory Approval of Penalties*

The Commissioner's burden of production under section 7491(c) includes establishing compliance with section 6751(b)(1), which provides that "[n]o penalty . . . shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." *See Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016); *see also Chai v. Commissioner*, 851 F.3d 190, 217, 221–22 (2d Cir. 2017), *aff'g in part, rev'g in part* T.C. Memo. 2015-42.[11] In *Belair Woods, LLC v. Commissioner*, 154 T.C. 1, 14–15 (2020), we explained that the "initial determination" of a penalty assessment is typically embodied in a letter "by which the IRS formally notifie[s] [the taxpayer] that [it] ha[s] completed its work and . . . ha[s] made a definite decision to assert penalties." Once the Commissioner introduces evidence sufficient to show written supervisory approval, the burden shifts to the taxpayer to show that the approval was untimely, viz, "that there was a formal communication of the penalty [to the taxpayer] before the proffered approval" was secured. *Frost v. Commissioner*, 154 T.C. 23, 35 (2020); *Thompson v. Commissioner*, T.C. Memo. 2022-80, at \*6.

---

[11] Section 6751(b)(1) does not apply to any addition to tax under section 6651, as was determined against Samuel and Maureen Braen. *See* I.R.C. § 6751(b)(2)(A).

**[\*24]** "The word 'determination' has 'an established meaning in the tax context and denotes a communication with a high degree of concreteness and formality." *Oxbow Bend, LLC v. Commissioner*, T.C. Memo. 2022-23, at \*5 (quoting *Belair Woods*, 154 T.C. at 15); *Beland v. Commissioner*, 156 T.C. 80, 85 (2021). "[T]he 'initial determination' of a penalty assessment will be embodied in a formal written communication to the taxpayer, notifying him that the Examination Division has completed its work and has made a definite decision to assert penalties." *Belair Woods*, 154 T.C. at 10. A "mere suggestion, proposal, or initial informal mention" of penalties does not, we have held, constitute an initial determination under section 6751(b)(1). *Tribune Media Co. v. Commissioner*, T.C. Memo. 2020-2, at \*19.[12]

The Braens advance two arguments regarding supervisory approval. First, they contend that the initial determination of penalties occurred during the 2013 examination of Holdings' 2010 return and lacked written supervisory approval. In the alternative, they claim that if the initial determination came in the answers in these cases, the Commissioner has failed to show supervisory approval. Neither argument convinces.

### 1. *2013 Examination into Holdings' 2010 Return*

We first conclude that the discussion of potential penalties against Holdings' shareholders in the notice of proposed adjustment did not constitute an initial determination.

---

[12] We recognize that there is a split among circuits as to whether written supervisory approval must be obtained before the IRS issues a notice of deficiency, *Chai v. Commissioner*, 851 F.3d at 221, or merely before the assessment, *Kroner v. Commissioner*, 48 F.4th 1272, 1278–79 (11th Cir. 2022), *rev'g in part* T.C. Memo. 2020-73; *see also Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1074 (9th Cir. 2022) (holding that section 6751(b)(1) "requires written supervisory approval before the assessment of the penalty or, if earlier, before the relevant supervisor loses discretion whether to approve the penalty assessment"), *rev'g and remanding* 154 T.C. 68 (2020).

Appeal of these cases would presumably lie in the U.S. Court of Appeals for the Third Circuit. I.R.C. § 7482(b)(1)(A); *Golsen v. Commissioner*, 54 T.C. 742 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971). *Golsen* stands for the proposition that this Court will apply the decision of the court of appeals that is "squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone" and, as a corollary, that this Court's own views will be given effect to the extent the relevant court of appeals has not expressed one. *See Golsen*, 54 T.C. at 757. The Third Circuit does not appear to have taken a clear stance on the section 6751(b)(1) issue.

**[*25]** A notice of proposed adjustment lacks the "high degree of concreteness and formality" that we have associated with an "initial determination" for section 6751 purposes. *Belair Woods*, 154 T.C. at 15; *Tribune*, T.C. Memo. 2020-2, at *18. This notice underscores its tentative nature (hinted by the title "proposed adjustment"):

> Based on the information we now have available and our discussions with you, we believe the proposed adjustment listed below should be included in the revenue agent's report. However, if you have additional information that would alter or reverse this proposal, please furnish this information as soon as possible.

"This text makes clear that a [notice of proposed adjustment], standing alone, is not a determination." *Tribune*, T.C. Memo. 2020-2, at *20 (considering similar text in a notice of proposed adjustment). Nor does the notice afford appeal rights, a common hallmark of finality. *Id.*

The attached Form 886-A addressing penalties does not support a different conclusion. Highlighting the unsettled nature of the notice, the Form 886-A stated that the revenue agent had proposed "potential" deficiencies underlying the recommended penalties. Although the Form 886-A includes a section entitled "Government's Position (Argument)" laying out the revenue agent's rationale for imposing penalties on the shareholders, it also includes a section entitled "Taxpayer's Arguments," that was altogether blank. This form did not establish that "penalties *will* be proposed." *See Kestin v. Commissioner*, 153 T.C. 14, 30 (2019) (quoting *Clay v. Commissioner*, 152 T.C. 223, 249 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021)). Instead, it "informed [the Braens] of the exam team's 'proposed adjustments'" and, together with the notice, provided for the possibility of further discussion, undermining any notion of "concreteness." *See Belair Woods*, 154 T.C. at 11, 15.

### 2. *Assertion of Penalties in the Answers*

The initial determination of penalties ultimately occurred when the Commissioner filed his answers in these cases. The answers were signed by Ms. Darcy, an attorney with the IRS Office of Chief Counsel, and Ms. Cannarozzi, an associate area counsel with the IRS Office of Chief Counsel. The Braens assert that the Commissioner has not established that Ms. Cannarozzi was Ms. Darcy's "immediate supervisor" as required by section 6751(b)(1).

**[\*26]**  As we have explained, the immediate supervisor "is most logically viewed as the person who supervises the . . . substantive work" involving the assertion of penalties.  *Sand Inv. Co. v. Commissioner*, 157 T.C. 136, 142 (2021).  In the answers, Ms. Cannarozzi identified herself as Ms. Darcy's immediate supervisor and represented that she "had the discretion to give or withhold her approval" of the penalties. Given these representations, we conclude that Ms. Cannarozzi was Ms. Darcy's immediate supervisor in these cases for purposes of section 6751(b)(1).  *Cf. Thompson*, T.C. Memo. 2022-80, at \*4, \*8; *Koh v. Commissioner*, T.C. Memo. 2020-77, at \*4 n.3 ("[T]he Court has found that an IRS Chief Counsel attorney satisfies the supervisory approval requirement . . . where the attorney's immediate supervisor personally approved in writing the assertion of a penalty that was first raised in the answer, as evidenced by the signature of [the Commissioner's] associate area counsel on the pleading."); *Roth v. Commissioner*, T.C. Memo. 2017-248, at \*10–11, *aff'd*, 922 F.3d 1126 (10th Cir. 2019).

The Braens have offered no evidence to contradict Ms. Cannarozzi's representations.  We therefore conclude that the Commissioner properly satisfied the written supervisory approval requirement of section 6751(b)(1).

###### B.    *Substantial Valuation Misstatement*

###### 1.    *Applicability of Penalty*

The Code imposes a penalty on taxpayers for any underpayment attributable to a substantial valuation misstatement.  I.R.C. § 6662(a), (b)(3).  A misstatement is "substantial" if the value of the property claimed on a return is 150% or more of the correct amount.  I.R.C. § 6662(e)(1)(A).[13]

---

[13] "Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one of the grounds set forth in section 6662(b)." *Sampson v. Commissioner*, T.C. Memo. 2013-212, at \*7–8 (citing *New Phoenix Sunrise Corp. v. Commissioner*, 132 T.C. 161, 187 (2009), *aff'd*, 408 F. App'x 908 (6th Cir. 2010)).  Consequently, we will not determine whether the Braens are liable for penalties for negligence or substantial understatements of tax.  We note that, were we to do so, our analysis of reasonable cause would be governed by different standards, which might well yield a different conclusion.  *See Whitehouse Hotel Ltd. P'ship v. Commissioner*, 755 F.3d 236, 249 (5th Cir. 2014), *aff'g in part, vacating in part and remanding* 139 T.C. 304 (2012); *Rogerson v. Commissioner*, T.C. Memo. 2022-49, at \*35; *Clary Hood, Inc. v. Commissioner*, T.C.

**[\*27]** On its 2010 return Holdings valued the portion of the property sold to Ramapo at \$10,472,000. To decide whether there was a substantial valuation misstatement, we must determine the property's fair market value, i.e., the price at which the property would change hands between a willing buyer and willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. *See* Treas. Reg. § 1.170A-1(c)(2).

To support their respective positions on the valuation question, the parties retained experts who testified at trial. We evaluate an expert's opinion in light of his qualifications and the evidence in the record. *See Champions Retreat Golf Founders, LLC v. Commissioner*, T.C. Memo. 2022-106, at \*10 (citing *Parker v. Commissioner*, 86 T.C. 547, 561 (1986)), *supplementing* T.C. Memo. 2018-146.

"We are not bound by an expert opinion that we find contrary to our judgment." *Plateau Holdings, LLC v. Commissioner*, T.C. Memo. 2020-93, at \*32. We may accept an expert's opinion in its entirety, or may accept only those portions we find reliable. *Emanouil*, T.C. Memo. 2020-120, at \*50 (citing *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282 (1938)); *Plateau Holdings*, T.C. Memo. 2020-93, at \*32. We also may determine fair market value based on our own examination of the record evidence. *Emanouil*, T.C. Memo. 2020-120, at \*50–51 (citing *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285).

a.      *Highest and Best Use*

"A 'critical aspect' in calculating fair market value is determining the 'highest and best use' of the property" at issue. *PBBM-Rose Hill, Ltd. v. Commissioner*, 900 F.3d 193, 209 (5th Cir. 2018) (quoting *Whitehouse Hotel Ltd. P'ship v. Commissioner*, 615 F.3d 321, 335 (5th Cir. 2010), *vacating* 131 T.C. 112 (2008)). We look to "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future." *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d 982, 996 (11th Cir. 2016) (quoting *Symington v. Commissioner*, 87 T.C. 892, 897 (1986)), *aff'g in part, rev'g in part and remanding* T.C. Memo. 2014-79. We must consider "[a]ny realistically available special use of property due to its adaptability to a particular business," but the fair market value "is not

---

Memo. 2022-15, at \*54–55, *aff'd in part, vacated in part, and remanded*, 69 F.4th 168 (4th Cir. 2023); *Rawls Trading, L.P. v. Commissioner*, T.C. Memo. 2012-340, at \*35–37.

**[\*28]** affected by whether the owner actually has put the property to its highest and best use." *Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986).

"The highest and best use inquiry is one of objective probabilities," and the "'realistic, objective potential uses for property control' its valuation." *Esgar Corp. v. Commissioner*, 744 F.3d 648, 657 (10th Cir. 2014) (quoting *Symington*, 87 T.C. at 896), *aff'g* T.C. Memo. 2012-35, 2012 WL 371809, *and aff'g Temple v. Commissioner*, 136 T.C. 341 (2011). Importantly, "[a] suggested higher use other than current use 'requires both "closeness in time" and "reasonable probability."'" *Id.* at 658 (quoting *Hilborn v. Commissioner*, 85 T.C. 677, 689 (1985)); *see also United States v. 269 Acres, More or Less, Located in Beaufort Cnty.*, 995 F.3d 152, 164 (4th Cir. 2021) ("[T]o base [value] on a use other than the current one, the landowner must produce evidence that the proffered use is '"reasonably probable" and that the probability has a real market value.'" (quoting *United States v. 69.1 Acres of Land, More or Less, Situated in Platt Springs Twp., Cnty. of Lexington*, 942 F.2d 290, 296 (4th Cir. 1991)).

"Any proposed use[] that 'depend[s] upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable,'" should not be considered a viable use. *See Esgar Corp. v. Commissioner*, 2012 WL 371809, at \*7 (quoting *Olson v. United States*, 292 U.S. 246, 257 (1934)). Although the highest and best use can be a use prohibited by zoning laws as of the date of contribution, such a proposed use "cannot be remote, speculative, or conjectural." *Dynamo Holdings Ltd. P'ship v. Commissioner*, T.C. Memo. 2018-61, at \*80.

The parties' experts reach vastly different values based primarily on differing conclusions as to the highest and best use of the property sold to Ramapo. The Braens rely on two experts: (1) Mr. Zdunczyk, who determined that the highest and best use of the sale parcel was a quarry and valued the mineral rights at $11,000,000, and (2) Mr. Fader, who provided four different potential valuations, including a value of $12,190,000 if quarrying were the highest and best use. The Commissioner relies on a report by Hilco Real Estate Appraisal (Hilco), which valued the sale parcel at $4,850,000 with a highest and best use of limited residential development.

As an initial matter, the record leaves us with the firm conviction that, as of September 29, 2010, no reasonable probability existed that

[*29] Holdings would be able to procure within a reasonable time the approvals, zoning changes, and permits required for quarrying. Although we do not doubt Holdings' intentions when it purchased the property or the land's suitability for a quarry, the governmental obstacles proved too much. Any thought otherwise represents a mixture of hope and conjecture.

Specifically, Holdings failed to make significant progress with DEC in obtaining the required state mining permit. From the start, DEC identified significant environmental concerns that needed to be addressed before the issuance of a mining permit. Despite investing time, effort, and expense, Holdings did not obtain authorization of studies relating to two of the major issues, much less assuage DEC's underlying concerns. *Cf. Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 997 (finding reasonable probability that development would be approved where the decision-making agency issued an ordinance describing particular requirements for development applications).

Holdings was similarly unsuccessful with Ramapo, and there were no real prospects that the town would change its stance. Ramapo had a longstanding prohibition on quarrying when Holdings submitted its petition for a zoning amendment in 1997, which was consistent with the negative views of quarrying expressed during and after the 1998 scoping hearing. *Cf. Johnston v. Commissioner*, T.C. Memo. 1997-475, 1997 WL 643299, at *19.

Ramapo's views only hardened over time. Seven years after Holdings initially sought the zoning amendment that would remove quarrying from prohibited uses, Ramapo passed a comprehensive zoning law that changed the zoning of the Ramapo portion of the property to an "R-40" low-density rural residential district. In the Draft Comprehensive Plan, Ramapo stressed that "additional . . . industrial development . . . would have considerable potential to cause significant harm to these critical resources" and recommended the prohibition of "uses that have the greatest potential to cause environmental impact."

We have previously remarked that "we should not consider [a] potential use in valuing the property" "if a hypothetical buyer [at the time of the bargain sale] would not have reasonably considered a potential use of the property." *Boone*, T.C. Memo. 2013-101, at *27 (citing *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 336 (2011)); *Glade Creek Partners, LLC v. Commissioner*, T.C. Memo. 2020-148, at *34, *aff'd in part, vacated in part and remanded*, No. 21-11251, 2022 WL

[*30] 3582113 (11th Cir. Aug. 22, 2022). A hypothetical buyer here would be unlikely to view quarrying as possible in light of the inability of Holdings—an established mining company with a long history of success—to obtain the requisite government approvals despite a decade of effort.

The quarry here is exactly the sort of proposed use that, at best, depended "upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable." *See Esgar Corp. v. Commissioner*, 2012 WL 371809, at *7 (quoting *Olson*, 292 U.S. at 257). We see no reasonable probability that Holdings could obtain DEC's blessing of the mining permit or overcome Ramapo's entrenched opposition after eight years of stasis. Accordingly, quarrying was not the property's highest and best use.[14]

Excluding quarrying leaves residential development as the highest and best use of the property. Our conclusion on this point rests on the common opinion of the parties' experts, each of whom identified residential development as the property's highest and best use in the absence of quarrying.[15]

b. *Valuation*

i. *Expert Views*

To value the 425.5 acres sold to Ramapo, both parties' experts turn to the sales comparison method, which "values a property by comparing it to similar properties sold in arm's-length transactions in or about the same period." *Champions Retreat*, T.C. Memo. 2022-106, at *21; *see also Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979). The reliability of this method "depends to a great extent upon the comparables selected and the reasonableness of the adjustments made thereto." *Wolfsen Land*, 72 T.C. at 19–20. The appraiser considers differences in various aspects of the comparable properties such as time of sale, size, location, or other significant features and then makes

---

[14] Given our conclusion that the highest and best use of the property was not quarrying, we will not further consider Mr. Zdunczyk's mineral appraisal. *See Glade Creek*, T.C. Memo. 2020-148, at *37 (noting that an expert's valuation "is of little relevance" where the expert adopted a different highest and best use from the Court's).

[15] Although Mr. Fader's expert report also provides a valuation based on a highest and best use under the assumption that the Ramapo portion of the property would be zoned industrial, he affirmed both during cross and redirect examination that "it was [his] opinion that the highest and best use was as residential."

**[*31]** appropriate adjustments for each to approximate the qualities of the property. *See, e.g.*, *Champions Retreat*, T.C. Memo. 2022-106, at *21; *see also Johnson v. Commissioner*, T.C. Memo. 2020-79, at *28–29.

Both experts also decided that dividing the 425.5 acres in two and performing separate valuations for each parcel would best capture the fair market value of the property as a whole.[16] After that starting point, never the twain would meet (as an analytic matter, at least).

a)      *Mr. Fader's Report*

For his part, Mr. Fader determined that the two parcels should be broken down between the three lots in Ramapo and the two lots in Hillburn. This distribution stemmed from his "belie[f] that for marketing and sales purposes, the real estate industry and a purchaser/developer would analyze and value these two parcels separately" because the property is spread across "two separate tax lots located in [two] separate jurisdictions."

Mr. Fader concluded that the 367-acre Ramapo parcel had a fair market value of $4,861,865, based upon a per-acre value of $13,248. In the course of his valuation, Mr. Fader considered (1) a 2009 sale of 247.9 acres in Ramapo for $11,500,000 (Sterling sale), (2) a 2010 sale of 93.3 acres in Sloatsburg (a village, like Hillburn, within Ramapo) for $1,900,000, and (3) a 2009 sale of 47.5 acres in Warwick, New York (in Orange County, which is adjacent to Ramapo's home county of Rockland County), for $287,500. Mr. Fader made downward adjustments of more than 57% to the Sterling sale to account for, inter alia, (1) the fact that approvals for a subdivision development had been obtained before sale and (2) differences in topography. Although he noted that the Warwick sale involved property zoned "Agricultural Single Family," he did not make any adjustment for that zoning (or for the zoning in Sloatsburg) based on his view that the Ramapo parcel and the comparable "are within similar residential districts."

For the 58.5-acre Hillburn parcel, Mr. Fader reached a fair market value of $1,980,901, based upon a per-acre value of $33,862. Although Mr. Fader's report discussed three sales, he "eliminated" one sale because the property was not comparable. This elimination left only

---

[16] Mr. Fader also included a valuation of $5,635,000, treating the 425.5 acres as one parcel of property. Mr. Fader, however, stated his "opinion that a two-parcel valuation will reflect a more accurate market value of the property address in this report," and we will thus focus on the valuation he deems more accurate.

[*32] two sales: (1) the 2009 sale of agricultural property in Warwick, which he also had used in valuing the Ramapo parcel, and (2) a 2009 sale of 39.6 acres in Monroe Township, New York (also in Orange County), for $3,022,729. As to the latter, Mr. Fader made a 10% adjustment to its $76,332 per-acre price to account for a portion of the property zoned light industrial.

Stitching the values of his two parcels together, Mr. Fader concluded that the 425.5 acres had a fair market value of $6,840,000.

b)      *Hilco Report*

The Hilco appraisal report, on the other hand, fixed its two parcels based on contiguity. Specifically, one of the lots at issue was separated from the other four by the 80-acre lot that Holdings had retained as part of the sale to Ramapo. Hilco concluded that the noncontiguous lot "would be more likely to be sold off separately . . . due to the separation" and thus valued that lot of 115.70 acres and the remaining 309.90 acres as distinct parcels.

With respect to the valuation of the noncontiguous parcel of 115.70 acres, Hilco determined a per-acre value of $18,800, which produced a total value of $2,180,000. Hilco relied on (1) a 2016 sale of 135 acres in Monroe, New York (Orange County), for $3,000,000, (2) a 2010 sale of 99.10 acres in West Milford, New Jersey (located in Passaic County, which borders Rockland and Orange Counties), for $2,250,000, (3) the 2010 Sloatsburg sale considered by Mr. Fader, and (4) a 2010 sale of 139 acres in Highlands, New York (Orange County) for $1,600,000. Hilco took the position that the 2016 sale was relevant because of its view that there had been few changes to prices for vacant residential land in the five years since the valuation date. Hilco found the Sloatsburg property to be the most comparable, with adjustments to account for small differences in size, zoning, site conditions, and frontage.

As to the 309.9-acre parcel composed of the rest of the property, Hilco found a per-acre value of $8,600, which produced a total value of $2,670,000. For this value, Hilco considered (1) a 2016 sale of 240.27 acres in Stony Point, New York (Rockland County), for $1,573,220, (2) a 2016 sale of 340.28 acres in Tuxedo, New York (Orange County), for $3,288,679, (3) a 2010 sale of 174.4 acres in Orange County for $1,940,000, and (4) a 2007 sale in Ramapo of 260.68 acres for $1,900,000. As in connection with the other parcel, Hilco explained that it would

[*33] consider 2016 sales given the minimal movement in the vacant residential land market.  It then applied various adjustments to the sale prices to account for differences in the properties.  Hilco did note that it "considered but did not use" the Sterling sale, which had received "final approval for a senior housing subdivision" before sale, because of concerns about the arm's-length nature of the transaction and topographical differences.

Putting the values of the parcel together, Hilco concluded that the 425.5 acres had a fair market value of $4,850,000.

ii.    *Analysis*

Although both experts generally support their opinions, we believe that Hilco has the better overall methodology and valuation.  As an initial matter, we agree with Hilco's division of lots based on contiguity, viz, that the noncontiguous lot would be more likely to be sold by itself rather than as part of a Ramapo lot package.  Mr. Fader fails to persuade us that the separate tax lots or jurisdictions would present an impediment to selling the adjacent lots in Ramapo and Hillburn together (as was done when Holdings purchased the property in 1998 and again when it sold these 425.5 acres in 2010).  Although we recognize some differences in the rural residential zoning designations of Ramapo and Hillburn at issue here, Mr. Fader did not see fit to distinguish between the two in his appraisal, and we do not believe that the differences require separating the lots by town for valuation purposes.

Turning to the analysis of Hilco's two-parcel valuation, we first note that Hilco factors in sales from 2016 in its valuation of both parcels.  "[E]vidence of lot sales within a reasonable period after the date of valuation . . . tends to make a given estimate of the lot prices more or less likely . . . ." *Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010-283, 2010 WL 5395108, at *12, *aff'd*, 493 F. App'x 944 (10th Cir. 2012).  We wonder whether five years constitutes a reasonable period even granting the relatively stable market for vacant residential land described in Hilco's report, and we will accordingly give less weight to the 2016 sales.

We conclude that the value of the noncontiguous lot is $20,000 per acre, with a total value of $2,314,000 for the 115.7 acres.  We place primary reliance on the February 2010 sale of 93.3 acres in Sloatsburg, which was discussed by both the Hilco report and the Fader report (in

**[*34]** the context of the 367-acre Ramapo parcel). We agree with both reports that this sale involved land quite similar to the noncontiguous lot, although we conclude that the price-per-acre value for the noncontiguous lot would be closer to the actual price of the Sloatsburg sale than Hilco determined. In particular we believe that Hilco's adjustments for differences in site conditions, size, and road frontage were slightly overstated. We draw further support for this conclusion from the 2010 sale of land in Passaic County for $22,704. Although this sale is somewhat less comparable than the Sloatsburg sale, we believe that after appropriate adjustments it weighs in favor of a higher price-per-acre than determined by Hilco.

For the 309.9-acre parcel, we find a value of $9,400 per acre and a total value of $2,913,060. We find Hilco's valuation of $8,600 to be reasonable by and large. In determining that a slight increase is appropriate, we pay particular heed to the adjusted values of the 2016 sale in Tuxedo, which Hilco deemed to be the strongest comparable, and the 2010 sale in Ramapo. Nor do we second-guess Hilco's decision to exclude the Sterling sale from consideration. The property involved in that sale bears limited topographical similarities to the parcel at issue, and the sale came after approvals had already been procured. We are unconvinced that the Sterling sale is comparable, as evidenced by Mr. Fader's decision to apply a material discount when attempting to use it.

Combining the values we have found produces a fair market value of $5,227,060 for the 425.5 acres sold to Ramapo. Our conclusion as to valuation is broadly consistent with other evidence in the record, including (1) the 1998 purchase price of $3,500,000 for the entirety of the property, (2) the 2008 appraisals obtained by New York valuing the parcel ultimately sold to Ramapo at $3,400,000 and $2,900,000, and (3) Mr. Fader's 2011 appraisal valuing the 425.5 acres at $5,845,000. The $10,472,000 value stated on Holdings' 2010 tax return thus constitutes a substantial valuation misstatement as it exceeds 150% of the value we have determined.[17] *See* I.R.C. § 6662(e)(1)(A).

2. *Reasonable Cause*

Under section 6664(c)(1), in general "[n]o penalty shall be imposed under section 6662 . . . with respect to any portion of an

---

[17] We note in passing that, even if we were to endorse the highest nonquarry value endorsed by Mr. Fader in his report, i.e., $6,840,000, the value on Holdings' 2010 tax return would constitute a substantial valuation misstatement.

**[\*35]** underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." "Reliance on professional advice may constitute reasonable cause and good faith . . . ." *Evans v. Commissioner*, T.C. Memo. 2010-207, 2010 WL 3735709, at \*10. A taxpayer's reliance on professional advice constitutes reasonable cause where (1) the adviser on which the taxpayer relied was a competent professional with sufficient experience to justify the reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. *Neonatology Assocs.*, 115 T.C. at 99; *Evans v. Commissioner*, 2010 WL 3735709, at \*10.

Heightened requirements apply to the reasonable cause exception for valuation overstatements with respect to property for which a deduction has been claimed under section 170: (1) the value of the property must be based on a qualified appraisal made by a qualified appraiser and (2) the taxpayer must have made a good faith investigation into the value of the contributed property. I.R.C. § 6664(c)(3); *McGrady v. Commissioner*, T.C. Memo. 2016-233, at \*54–55; *Costello*, T.C. Memo. 2015-87, at \*35–36; *Esgar Corp. v. Commissioner*, 2012 WL 371809, at \*23; Treas. Reg. § 1.6664-4(h)(1). The qualified appraisal required for purposes of section 6664(c)(3)(A) is the same as under section 170(f)(11). I.R.C. § 6664(c)(4)(B); *Costello*, T.C. Memo. 2015-87, at \*37.

Treasury Regulation § 1.170A-13(c)(3)(ii) sets out the requirements for qualified appraisals. *See* I.R.C. § 170(f)(11)(E)(i); *Cave Buttes*, 147 T.C. at 348. Qualified appraisals must include, inter alia, the "terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed." Treas. Reg. § 1.170A-13(c)(3)(ii)(D). This requirement extends to any agreement that "[r]eserves to, or confers upon anyone (other than a donee organization or an organization participating with a donee organization in cooperative fundraising) any right . . . to the possession of the property." *Id.* subdiv. (ii)(D)(*2*). This information "enables the IRS to determine whether the appraiser took restrictions on the disposition of the contributed property into account when appraising it." *Alli v. Commissioner*, T.C. Memo. 2014-15, at \*25.

**[\*36]** Neither appraisal on which Holdings based its valuation satisfied the qualified appraisal requirements.[18] *See* I.R.C. § 6664(c)(3); *see also Costello*, T.C. Memo. 2015-87, at \*35–36; Treas. Reg. § 1.170A-13(c)(5)(iii) ("If the donor uses the appraisal of more than one appraiser, . . . each appraiser shall comply with the requirements of [Treasury Regulation § 1.170A-13(c)] . . . ."). The appraisals failed to include the terms of either the settlement agreement or Ramapo's agreement with New York to sell three lots, both of which "relate[] to the use, sale, or other disposition of the property contributed." *See* Treas. Reg. § 1.170A-13(c)(3)(ii)(D).[19]

To be more specific, the land purchase agreement provides that "th[e zoning] lawsuit is being settled as part of the conveyance of the [p]roperty from [Holdings] to the Town of Ramapo." In a later section entitled "Subject to Court Approval and Settlement," the agreement specifies that the sale was "contingent on the settlement of" the zoning litigation "and the entry by the Court of an Order which shall include the subdivision of the property in substantial conformity with the proposed order appended hereto." Likewise, the land purchase agreement provided that Ramapo's "obligation hereunder is expressly conditioned upon the execution and all necessary approvals of the contract of sale between" Ramapo and New York and stated that it would be "null and void" if the agreement between Ramapo and New York was not executed.

"Information concerning such agreements is essential to enable the IRS to evaluate . . . whether the donors have received or will receive something in exchange for their gift." *Costello*, T.C. Memo. 2015-87, at \*19; *see also Alli*, T.C. Memo. 2014-15, at \*26. Although the cover letter to Mr. Fader's appraisal report indicates that he was provided the contract of sale between Holdings and Ramapo, the appraisal neither attached nor described the terms of the land purchase agreement, the settlement agreement, or the Ramapo-New York agreement. Mr. Zdunczyk went a bit further, including the land purchase agreement as

---

[18] The Braens contend that Holdings reasonably relied upon the advice offered by McGladrey. The Braens fail to offer convincing support for the proposition that interposing an accounting firm to offer a reconciliation of underlying appraisals insulates the appraisals from the requirements of section 6664(c)(3).

[19] We further note that the agreement between Ramapo and New York "confer[red] upon" New York a "right . . . to the possession of the property." *See* Treas. Reg. § 1.170A-13(c)(3)(ii)(D)(*2*). Holdings does not argue that New York was an "organization participating with a donee organization in cooperative fundraising," so we do not address that possibility. *Id.*

**[\*37]** an attachment to his appraisal. The Braens argue that this suffices as the land purchase agreement references both the settlement agreement and the agreement between Ramapo and New York, but the land purchase agreement does not set forth the terms of the other agreements and thus cannot cure the omissions in Mr. Zdunczyk's appraisal. *See* Treas. Reg. § 1.170-13A(c)(3)(ii)(D).

Holdings thus did not strictly comply with the qualified appraisal requirements. The Braens contend, however, that any shortcomings are excused by the substantial compliance doctrine. *See Kaufman v. Shulman*, 687 F.3d 21, 29 (1st Cir. 2012) (noting that substantial compliance can be used to "forgive minor discrepancies"), *vacating in part and remanding* 136 T.C. 294 (2011), *and* 134 T.C. 182 (2010).

The "key question" for substantial compliance "is whether the requirements [at issue] relate 'to the substance or essence of the statute.'" *Loube v. Commissioner*, T.C. Memo. 2020-3, at \*17 (quoting *Bond v. Commissioner*, 100 T.C. 32, 41 (1993)). If they do, "strict adherence to the statutory and regulatory requirements is mandatory," and substantial compliance does not apply. *Id.* at \*17–18. This "doctrine 'should not be liberally applied'" and is no "substitute for missing entire categories of content." *Costello*, T.C. Memo. 2015-87, at \*23–24 (first quoting *Alli*, T.C. Memo. 2014-15, at \*54; and then quoting *Hendrix v. United States*, No. 2:09-cv-132, 2010 WL 2900391, at \*5 (S.D. Ohio July 21, 2010)); *see Chiarelli v. Commissioner*, T.C. Memo. 2021-27, at \*17–18; *Brannan Sand & Gravel Co. v. Commissioner*, T.C. Memo. 2020-76, at \*17–18. "[R]ather, it is at most a means of accepting a nearly complete effort that has simply fallen short in regard to minor procedural errors or relatively unimportant clerical oversights." *Costello*, T.C. Memo. 2015-87, at \*23–24 (quoting *Hendrix*, 2010 WL 2900391, at \*5).

The omissions here "were not trivial, formal, or mechanical." *Costello*, T.C. Memo. 2015-87, at \*19. The requirement to set forth terms relating "to the use, sale, or other disposition of the property contributed," Treas. Reg. § 1.170A-13(c)(3)(ii)(D), goes to the IRS's evaluation of whether the taxpayer received anything of value as part of a sale, *see Costello*, T.C. Memo. 2015-87, at \*19; *Smith v. Commissioner*, T.C. Memo. 2007-368, 2007 WL 4410771, at \*20, *aff'd*, 364 F. App'x 317 (9th Cir. 2009); *see also RERI Holdings I, LLC v. Commissioner*, 149 T.C. 1, 16–17 (2017) (framing substantial compliance as focusing on whether the donor provided sufficient information to permit the IRS to evaluate the reported contribution), *aff'd sub nom. Blau v.*

**[\*38]** *Commissioner*, 924 F.3d 1261 (D.C. Cir. 2019). This issue is at the very heart of the matter. *See Hewitt v. Commissioner*, 109 T.C. 258, 265 (1997), *aff'd*, 166 F.3d 332 (4th Cir. 1998); *Bond*, 100 T.C. at 41. We thus conclude that the doctrine of substantial compliance does not apply. *See* I.R.C. § 6664(c)(3)(A).

The Braens finally argue that any failure to comply with the qualified appraisal requirements should be excused for reasonable cause under section 170(f)(11)(A)(ii)(II). But this defense does not apply in the context of section 6664(c)(3). *See Gorra v. Commissioner*, T.C. Memo. 2013-254, at \*62. Section 6664(c)(3) provides an *additional* requirement applicable to substantial valuation overstatements, on top of the ordinary reasonable cause requirements. *See Costello*, T.C. Memo. 2015-87, at \*35–36; Treas. Reg. § 1.6664-4(h)(1), (3). Applying the reasonable cause defense to the qualified appraisal requirement under section 6664(c)(3)(A) would thus render the additional requirement meaningless.

We therefore conclude that the Braens are liable for the substantial valuation misstatement penalties and are not entitled to the reasonable cause defense under section 6664(c)(3).

C.      *Section 6651(a)(1) Addition to Tax*

Section 6651(a)(1) imposes an addition to tax for the failure to timely file a required return unless the taxpayer establishes that such failure was due to "reasonable cause and not due to willful neglect." *United States v. Boyle*, 469 U.S. 241, 243 (1985); *Williams v. Commissioner*, T.C. Memo. 2022-7, at \*4. Although Samuel and Maureen Braen were required to file their 2010 return by October 15, 2011, they did not sign that return until December 7, 2011, and accordingly filed their return late.

The Braens contend that "[t]he facts . . . establish that to the extent" Samuel and Maureen's return was filed late, "there was reasonable cause and any such penalty should be excused." The Braens fail to identify any reasonable cause, and we thus find Samuel and Maureen Braen liable for the determined section 6651(a)(1) addition to tax for their 2010 tax year.

IV.      *Conclusion*

For the reasons explained above, none of the Braens is entitled to any charitable contribution deduction. The Braens are also liable for a

**[\*39]** substantial valuation misstatement penalties under section 6662(b)(3) and (e), and Samuel and Maureen Braen are additionally liable for the determined section 6651(a)(1) addition to tax.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*